UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LITIGATION LAWYERS, PROFESSIONAL ASSOCIATION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Case No. 4:24-cv-00793-SRC |
| CHRISTOPHER HARBISON and REGINA HARBISON, | ) ) ) ) |
| Defendants. | ) ) |

**Memorandum and Order**

Tensions periodically swell between lawyers and their clients—ofttimes when a larger-than-anticipated invoice comes knocking. Dissatisfied with Litigation Lawyers's legal representation and flummoxed by prolonged legal tasks and mounting fees, Christopher and Regina Harbison asserted four amended counterclaims against Litigation Lawyers. After initially suing the Harbisons, Litigation Lawyers looks to shield itself from liability and thus asks the Court to dismiss all the Harbisons' claims under Federal Rule of Civil Procedure 12(b)(6).

**I.  Background**

    **A.  Factual background**

The Court accepts the following facts from the Harbisons' amended counterclaims, doc. 85 at 14–23 (The Court cites to page numbers as assigned by CM/ECF.),[1] as well pleaded and true for the purposes of this memorandum and order. The Harbisons hired Stephen Rakusin,

---

[1] The Court notes that the Harbisons included their amended counterclaims in the same document as their amended answer. *See* doc. 85 at 1–14 (amended answer and affirmative defenses); *id.* at 14–23 (amended counterclaims). The document includes numerous sets of consecutively numbered paragraphs utilizing the same method of identification (i.e., paragraph 1, 2, 3, etc.). For the sake of clarity, the Court, in this memorandum and order, cites only to the paragraph numbers of the Harbisons' amended counterclaims, beginning on page fourteen of that document. *Id.* at 14–23.

an attorney, to represent them in their defense against two lawsuits—one in Missouri state court and one in this Court, both involving business entities associated with the Harbisons.  *Id.* at ¶¶ 8–10.  Rakusin, who served as the president of Litigation Lawyers, represented the Harbisons for over one year in both suits.  *Id.* at ¶¶ 6, 11.  As part of the representation, the parties entered a retainer agreement that "set forth the terms and conditions of Rakusin's representation and the scope of his legal services."  *Id.* at ¶¶ 10, 12.

Pursuant to the retainer agreement, "Rakusin was required to only perform services 'necessary' to represent the Harbisons including, but not limited to, preparing pleadings and motions, correspondence with the Harbisons, opposing counsel, and other parties, research, fact investigation, travel, depositions, and court appearances."  *Id.* at ¶ 15 (quoting doc. 85-1 at ¶ 1).  Rakusin was also "obligated to represent the Harbisons 'in a manner most consistent' with their goals, including cost efficiency."  *Id.* at ¶ 16 (quoting doc. 85-1 at ¶ 5).  Likewise, Rakusin "was obligated to practice 'consistent with legal and ethical standards,' including the Missouri Rules of Professional Conduct."  *Id.* at ¶ 17 (quoting doc. 85-1 at ¶ 10).

In the face of these "legal, ethical, and contractual obligations, Rakusin engaged in self-serving conduct and ineffective legal actions," which "did not benefit the Harbisons, did not resolve the" lawsuits against them, "and resulted in over $1 million in attorneys' fees and legal costs."  *Id.* at ¶ 18.  Specifically, "Rakusin engaged in ineffective motion practice, pursued legal actions contrary to established precedent, . . . unnecessarily prolonged litigation," and did not "resolve, or even attempt to resolve, the" lawsuits against the Harbisons.  *Id.* at ¶ 19.

"[T]hroughout Rakusin's entire representation of the Harbisons," he "did not prepare and implement a reasonable settlement strategy, provide advice to the Harbisons about the prospects of a negotiated settlement, or even mention the potential benefits of a settlement to" them.  *Id.*

2

at ¶ 21.  "Instead of implementing a reasonable settlement strategy," which "could have . . . efficiently and justly resolved" the lawsuits against the Harbisons, Rakusin "pursued costly and unnecessary litigation and invoiced over $1 million in legal fees."  *Id.* at ¶¶ 22–23.  "Rakusin's litigation tactics" in the underlying lawsuits caused one opposing party "to incur over $2 million in attorneys' fees . . . for which it sought recovery from the Harbisons."  *Id.* at ¶ 24.

Instead of "bill[ing] for 'necessary' legal actions," Rakusin "routinely billed for excessive and unnecessary legal actions."  *Id.* at ¶ 25.  For example, he "bill[ed] a total of 371.91 hours" for work completed in "the 31-day span from October 16, 2021, to November 15, 2021."  *Id.*  After "approximately one year" of Rakusin's representation, "and no real progress . . . made," the Harbison's "were forced to retain new counsel at their own expense to remediate the damage done by Rakusin."  *Id.* at ¶ 26.  When they terminated Rakusin, the Harbisons had paid Litigation Lawyers "approximately $695,000."  *Id.* at ¶ 27.  "After new counsel was retained, the" lawsuits against the Harbisons were "resolved via reasonable settlement negotiations in less than one year."  *Id.* at ¶ 28.

**B.**     **Procedural background**

Litigation Lawyers originally filed suit against the Harbisons in Florida state court, and the Harbisons removed the case to the United States District Court for the Southern District of Florida.  Doc. 1 at 1.  The latter court then transferred the case to this Court.  *See* docs. 47–48.  When the Court received the case, it held a hearing to address several pending motions.  *See* doc. 76.  At the hearing, the Court denied all pending motions and ordered the parties to meet and confer on numerous issues.  *See* doc. 77.

A few weeks later, the Harbisons filed their amended counterclaims, asserting four claims against Litigation Lawyers:  legal malpractice; breach of fiduciary duty; breach of the implied

3

covenant of good faith and fair dealing; and unjust enrichment. *See* doc. 85 at ¶¶ 29–60. Litigation Lawyers countered by filing its motion to dismiss. Docs. 86–87. Following a status conference in October 2024, *see* doc. 92, the Court ordered the parties to file supplemental choice-of-law briefing, *see* doc. 93, and the parties complied, *see* docs. 94–96. The Court now addresses Litigation Lawyers's motion to dismiss.

**II.     Standard**

Under Rule 12(b)(6), a party may move to dismiss a claim for "failure to state a claim upon which relief can be granted." The notice pleading standard of Rule 8(a)(2) requires a plaintiff to give "a short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To meet this standard and to survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This requirement of facial plausibility means the factual content of the plaintiff's allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678). The Court must grant all reasonable inferences in favor of the nonmoving party. *Lustgraaf v. Behrens*, 619 F.3d 867, 872–73 (8th Cir. 2010).

When ruling on a motion to dismiss, a court "must liberally construe a complaint in favor of the plaintiff." *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 862 (8th Cir. 2010). However, if a claim fails to allege one of the elements necessary to recover on a legal theory, the Court must dismiss that claim for failure to state a claim upon which relief can be granted. *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 355 (8th Cir. 2011). Threadbare recitals of a cause of action,

4

supported by mere conclusory statements, do not suffice. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79. "A pleading that merely pleads 'labels and conclusions,' or a 'formulaic recitation' of the elements of a cause of action, or 'naked assertions' devoid of factual enhancement will not suffice." *Hamilton v. Palm*, 621 F.3d 816, 817 (8th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678). Although courts must accept all factual allegations as true, they are not bound to take as true a legal conclusion couched as a factual allegation. *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 677–78.

Only a complaint that states a plausible claim for relief survives a motion to dismiss. *Iqbal*, 556 U.S. at 679. Therefore, the Court must determine if the well-pleaded factual allegations "plausibly give rise to an entitlement to relief." *Id*. This "context-specific task" requires the Court to "draw on its judicial experience and common sense." *Id*.

### III. Discussion

#### A. Applicable law

After reviewing the parties' motion-to-dismiss briefs, docs. 86–88, 91, the Court determined that it needed additional briefing to understand which state's (or states') law the Court must apply when reviewing the sufficiency of the Harbisons' amended counterclaims, *see* doc. 93. The Court posed the following question: under Florida's choice-of-law principles, does Missouri or Florida substantive law apply to each of the Harbisons' counterclaims? *See* doc. 93. In response to the Court's order, it received three briefs from the parties. Docs. 94–96.

With that in mind, the Court starts with the applicable choice-of-law rules and then applies those rules to the Harbisons' claims.

5

### 1. Choice-of-law framework

As the Court explained in its supplemental-briefing order, "Florida's choice-of-law principles apply." Doc. 93 at 2 (first citing *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964); and then citing *Lucarelli v. Renal Treatment Ctrs.-Ill., Inc.*, No. 4:08 CV 00099 ERW, 2008 WL 4402255, at *2 (E.D. Mo. Sept. 24, 2008)). As the Supreme Court of the United States concluded, "where the defendants seek transfer, the transferee district court must be obligated to apply the state law that would have been applied if there had been no change of venue." *Van Dusen*, 376 U.S. at 639. And so in this case, "if there had been no change of venue," Florida "state law . . . would have been applied." *Id.*; *see also* doc. 1 at 1 (removing the case to the Southern District of Florida).

Next, the Court must "ascertain the nature of the problem involved: e.g.[,] torts, contracts, property, divorce, etc." *Aetna Cas. & Sur. Co. v. Huntington Nat'l Bank*, 587 So. 2d 483, 485 (Fla. Dist. Ct. App. 1991) (citing *Acme Circus Operating Co. v. Kuperstock*, 711 F.2d 1538, 1540 (11th Cir. 1983)). To do so, the Court scrutinizes the operative pleading and must look to Florida law to see how it characterizes each claim. *Id.*; *see, e.g.*, *Hoffman v. Ouellette*, 798 So. 2d 42, 44 (Fla. Dist. Ct. App. 2001) ("The issues framed by the pleadings were based in tort law." (citation omitted)); *Marion Power Shovel Co. v. Hargis*, 698 So. 2d 1246, 1247 (Fla. Dist. Ct. App. 1997) (citing Florida law); *Potts v. Budget Rent a Car Sys., Inc.*, No. 4:04-CV-074-SPM, 2005 WL 3057175, at *2 (N.D. Fla. Nov. 14, 2005) (same).

After determining the nature of each claim (i.e., tort, contract, etc.), the Court must consider which choice-of-law test applies to each type of legal claim asserted. *See, e.g.*, *Aetna*, 587 So. 2d at 485 ("The next step in choice of law analysis is to determine the forum's choice of law rule."). For claims sounding in tort, "Florida applies the "significant relationships test."

6

*Hargis*, 698 So. 2d at 1247 (quoting Restatement (Second) of Conflict of Laws § 145(1) (Am. L. Inst. 1971)); *see Hoffman*, 798 So. 2d at 44 (applying the significant-relationships test to tort claims).  More on this in a moment.  And for claims sounding in contract, "Florida has 'long adhered to the rule of lex loci contractus,' which is that the law of the state where the contract was executed governs the rights and liabilities of the parties to the contract." *Paquin v. Campbell*, 378 So. 3d 686, 690 (Fla. Dist. Ct. App. 2024) (quoting *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, 1163 (Fla. 2006)).  More on this later as well.

Once the Court has identified the proper choice-of-law rule, the final step "is to apply" that "rule to the instant facts and thereby conclude which state's substantive law applies." *Id.* at 689 (quoting *Kuperstock*, 711 F.2d at 1540).  With all that, the Court first addresses the Harbisons' legal-malpractice and breach-of-fiduciary-duty claims.

## 2. Tort counterclaims

In their joint supplemental brief, the parties stipulated that Missouri law should apply to the Harbisons' counterclaims sounding in tort.  Doc. 94 at 1–2.  They reasoned that, under the four-factor significant-relationships test, "the relevant factors lead to the conclusion that Missouri has the most significant relationship to the Harbisons' tort counterclaims, and therefore Missouri law should apply to the same." *Id.* at 2.  But neither in their joint brief nor in their separate briefs did the parties clarify which of the four claims asserted a tort claim.  *See* docs. 94–96.  And so, while the Court tends to agree with the parties' stipulation, it must proceed through the choice-of-law framework and, first, "ascertain the nature of the problem involved." *Aetna*, 587 So. 2d at 485 (citing *Kuperstock*, 711 F.2d at 1540).

As for the Harbisons' legal-malpractice claim, Florida courts have not, based on this Court's research, clearly held that the cause of action sounds in tort.  Nor have Florida courts

7

clearly held that claims for legal malpractice sound in contract, either.  But when addressing the assignability of legal-malpractice claims, Florida caselaw has characterized "legal malpractice as a personal tort," due in part to "the personal nature of legal services which involve highly confidential relationships."  *Cowan Liebowitz & Latman, P.C. v. Kaplan*, 902 So. 2d 755, 758 (2005) (quoting *Forgione v. Dennis Pirtle Agency, Inc.*, 701 So. 2d 557, 559 (Fla. 1997); *see, e.g.*, *Nat'l Union Fire Ins. Co. v. Salter*, 717 So. 2d 141, 142 (Fla. Dist. Ct. App. 1998) (citing *Forgione*, 701 So. 2d at 557).  And so although the bulk of Florida caselaw describing legal-malpractice claims as a tort relates to the assignability of those claims, certainly an issue distinguishable from the instant case, the Court concludes that a legal-malpractice claim sounds in tort under Florida law for purposes of this choice-of-law analysis.

Regarding the Harbisons' claim for breach of fiduciary duty, Florida caselaw has not held whether a breach-of-fiduciary-duty claim, when raised in the attorney-malpractice context, sounds in tort or contract.  At least one Florida court has, however, determined that "[b]reach of fiduciary duty is a common law tort . . . ."  *LeBlanc v. Acevedo*, 258 So. 3d 555, 557 (Fla. Dist. Ct. App. 2018) (citation omitted).  To be sure, *LeBlanc* dealt with a "doctor-patient relationship"—not one between an attorney and her client.  *Id.*  And while differences certainly exist between the doctor-patient and attorney-client relationships, the Court, for purposes of this choice-of-law analysis, finds that a claim for breach of fiduciary duty asserted in the attorney-malpractice context sounds in tort.

Thus, with respect to both the legal-malpractice and breach-of-fiduciary-duty claims, the Court must then apply the significant-relationships test and consider "the place of injury"; "the place of the conduct causing the injury"; "the parties' domicile, residence, place of incorporation, and place of business"; and "the place where the parties' relationship is centered."  *Hargis*, 698

So. 2d at 1247 (citation omitted). As to the first factor, the parties agreed that "the alleged injury occurred" in "Missouri." Doc. 94 at 1. For the second factor, the parties agreed that "the alleged conduct causing the alleged injury occurred" in "both Florida and Missouri." *Id.* As for the third factor, the parties agreed that they reside in "both Florida and Missouri." *Id.* at 1–2. And with respect to the fourth factor, the Harbisons argued that "the relationship between the [p]arties . . . was centered in Missouri," while Litigation Lawyers argued that it "was centered in both Florida and Missouri." *Id.* at 2.

"[O]n balance," the parties stipulated "that the relevant factors lead to the conclusion that Missouri has the most significant relationship to the Harbisons' tort counterclaims." *Id.* "[T]herefore," the parties concluded, "Missouri law should apply to the" Harbisons' tort counterclaims. *Id.* The allegations in the amended counterclaims buttress the parties' conclusions as to each factor of the significant-relationships test. *See* doc. 85 at ¶¶ 8–11, 18–24, 26–28 (allegations describing Missouri as the location of the alleged injury); *see id.* at ¶¶ 11, 13, 18–21, 23, 25, 27, 30, 32, 34–35 (allegations describing both Florida and Missouri as the location of the conduct causing the alleged injury); *see id.* at ¶¶ 1–3, 6, 8–9 (allegations describing both Florida and Missouri as the parties' residences and places of business); *see id.* at ¶¶ 1–3, 6, 8–12, 18–21, 25–28, 34–35 (allegations describing both Florida and Missouri as the center of the parties' relationship).

Having analyzed the allegations in the Harbisons' amended counterclaims as well as the parties' arguments in their stipulation, the Court applies Missouri substantive law to the Harbisons' claims for legal malpractice and breach of fiduciary duty. *See USA Mach. Corp. v. CSC, Ltd.*, 184 F.3d 257, 263 (3d Cir. 1999) ("Because the parties appear to be in agreement on

9

th[e choice-of-law] issue, [the court] will assume, without deciding, that [the agreed-upon] law supplies the appropriate substantive rules.").

### 3. Contractual counterclaims

In its separate brief, Litigation Lawyers argued that Florida law should apply to the Harbisons' "contractual counterclaims." Doc. 95 at 1. Because the retainer agreement "was made in Florida," and not Missouri, Litigation Lawyers posited that Florida law should apply to the Harbisons' contractual claims. *Id.* at 2 (citation and quotations omitted). This is a bit peculiar, considering Litigation Lawyers cited Missouri law, nearly exclusively, in support of its motion to dismiss. *See* docs. 87, 91. For their part, the Harbisons, in their separate (and last-in-time) brief, did not state a position as to the nature of each of their counterclaims or respond to Litigation Lawyers's argument that Florida law should apply to the contractual claims. *See* doc. 96.

As for the Harbisons' remaining claims for breach of the implied covenant of good faith and fair dealing and unjust enrichment, the Court "ascertain[s] the nature of the problem involved." *Aetna*, 587 So. 2d at 485 (citing *Kuperstock*, 711 F.2d at 1540). In doing so, the Court determines that, under Florida law, both claims constitute contract or quasi-contract claims. *See, e.g.*, *QBE, Ins. Corp. v. Chalfonte Condo. Apartment Ass'n, Inc.*, 94 So. 3d 541, 548 (Fla. 2012) ("Florida contract law does recognize an implied covenant of good faith and fair dealing in every contract." (citations omitted)); *City Nat'l Bank of Fla. ex rel. Land Tr. No. 2400-9492-00 v. Signature Land, Inc.*, 397 So. 3d 1133, 1135 (Fla. Dist. Ct. App. 2024) ("In the absence of an enforceable express or implied-in-fact contract, a party may recover under a quasi-contract claim—like unjust enrichment."). On this point, the Court acknowledges its assertion to the contrary in its supplemental-briefing order, doc. 93 at 2 (commenting that the

10

Harbisons "exclusively raise[d] tort causes of actions"), and appreciates Litigation Lawyers's separate brief noting this oversight, *see* doc. 95.

Under Florida law, "the law of the state where the contract was executed governs the rights and liabilities of the parties to the contract." *Paquin*, 378 So. 3d at 690 (citing *Roach*, 945 So. 2d at 1163). Further, "[a] contract is created where the last act necessary to make a binding agreement takes place." *D.L. Peoples Grp., Inc. v. Hawley*, 804 So. 2d 561, 563 (Fla. Dist. Ct. App. 2002). Thus, "[w]here one contracting party signs the contract, and the other party accepts and signs the contract, a binding contract results." *Id.* (determining that a "contract was made in Florida" because "the last act necessary to complete the agreement, i.e., [the] President's signature, was performed in Florida").

Litigation Lawyers directed the Court to evidence in the record to conclude that Litigation Lawyers "was the last party to sign" the retainer agreement, "and it did so in Florida." Doc. 95 at 2 (citing doc. 19 at ¶¶ 26–27); *see also id.* (comparing doc. 7-2 at 16 with doc. 85-1 at 5). But when considering a motion to dismiss, a "court generally must ignore materials outside the pleadings." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). At the same time, a court "may consider 'some materials that are part of the public record or do not contradict the complaint,' as well as materials that are 'necessarily embraced by the pleadings.'" *Id.* (citations omitted); *cf. Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003) (concluding that the lower court properly considered "the Agreement and the 'Exhibit B' form, both of which were also attached to the appellants' complaint").

In that regard, the Harbisons appended a copy of the retainer agreement to their counterclaims. *See* doc. 85-1 at 1–7. They also cited and quoted language from the agreement throughout their allegations. *See, e.g.*, doc. 85 at ¶ 15 (quoting doc. 85-1 at ¶ 1); *id.* at ¶ 16

11

(quoting doc. 85-1 at ¶ 5); *id.* at ¶ 17 (quoting doc. 85-1 at ¶ 10). On the signature page of the agreement, the Harbisons signed their names, but Rakusin had not yet finalized the agreement on behalf of Litigation Lawyers. *See* doc. 85-1 at 5.

And so the Court can infer that, had Rakusin (or one of the firm's agents) signed the retainer agreement on behalf of Litigation Lawyers, that individual did so after the Harbisons signed the agreement. *See id.* Further, both parties acknowledged that they operated under the retainer agreement. *See, e.g.*, doc. 85 at ¶ 34 ("The Harbisons complied with and performed their obligations under the [retainer a]greement."); doc. 87 at 3 ("[The Harbisons] hired [Litigation Lawyers], pursuant to an engagement agreement . . . ."). But importantly, the Court cannot, based on the allegations in the counterclaims and the attached copy of the retainer agreement, deduce *where* Rakusin (or someone else) signed the retainer agreement on Litigation Lawyers's behalf. *See* doc. 85-1 at 5.

A factual issue thus remains regarding the execution of the retainer agreement. The Court cannot then, based on the information before it, determine where "the last act necessary to complete the agreement," *Hawley*, 804 So. 2d at 563, took place and, on that basis, cannot determine "where the contract was executed," *Paquin*, 378 So. 3d at 690 (citing *Roach*, 945 So. 2d at 1163). As a result, the Court cannot "apply the proper choice of law rule to the instant facts and thereby conclude which state's substantive law applies," *id.* at 689 (quoting *Kuperstock*, 711 F.2d at 1540), to the Harbisons' claims for breach of the implied covenant of good faith and fair dealing and unjust enrichment.

The Court notes that, at the motion-to-dismiss stage, it cannot consider Litigation Lawyers's previously filed affidavit, which provides information regarding where Litigation Lawyers executed the retainer agreement. *See* doc. 95 at 2 (citing doc. 19 at ¶¶ 26–27). And

12

Litigation Lawyers, in its separate supplemental brief, did not put forth any argument as to how the Court could consider the affidavit at the motion-to-dismiss stage. *See* doc. 95. To determine the choice-of-law issue on the contractual counterclaims, the Court needs an evidentiary record; accordingly, pursuant to Federal Rule of Civil Procedure 56(f), the Court issues a contemporaneous order, doc. 103, regarding the issue of where Rakusin (or one of Litigation Lawyers's agents) signed the retainer agreement. On that basis, the Court holds in abeyance its ruling on Litigation Lawyers's motion to dismiss with respect to the Harbisons' claims for breach of the implied covenant of good faith and fair dealing and unjust enrichment.

Having determined that Missouri law applies to the Harbisons' counterclaims sounding in tort, the Court proceeds to their claim for legal malpractice and then turns to their claim for breach of fiduciary duty.

**B.      Legal-malpractice claim**

The Harbisons' first claim concerns Rakusin's alleged legal malpractice. Throughout his representation, the Harbisons alleged, Rakusin "did not exercise due care and did not exhibit the skill and diligence ordinarily possessed and employed by a competent attorney in similar circumstances" and "breached the" retainer agreement in numerous ways. Doc. 85 at ¶¶ 32, 35. As a result, "the Harbisons incurred significant attorneys' fees and legal costs in the" lawsuits against them "and retained replacement counsel at their own expense to remediate" Rakusin's damage. *Id.* at ¶ 36. "But for Rakusin's negligence and breach of the" retainer agreement, the Harbisons claim they "would not have incurred such significant attorneys' fees and legal costs and could have prevailed on their defenses or reached a reasonable settlement much earlier in the case." *Id.* at ¶ 37.

13

Litigation Lawyers seeks dismissal of this claim, because the Harbisons did not "allege that they would have . . . prevailed on defenses or obtained an earlier settlement in the" lawsuits against them.  Doc. 86 at ¶ 6; *see also* doc. 87 at 8–12.  Instead, "[t]he allegation that [they] 'could have' prevailed on defenses or obtained an earlier settlement," Litigation Lawyers contends, "is insufficient under Missouri law."  Doc. 86 at ¶ 6.

Under Missouri law, legal-malpractice claims have four elements:  "(1) an attorney-client relationship; (2) negligence or breach of contract by the defendant; (3) proximate causation of plaintiff's damages"; and "(4) damages to the plaintiff."  *Klemme v. Best*, 941 S.W.2d 493, 495 (Mo. 1997) (citation omitted).  Notably, the third element includes "[c]ausation in fact," which requires "that but for the attorney's negligence, the result would have been different."  *Beazley Ins. Co., Inc. v. Brown & James, P.C.*, No. 4:18-cv-01689-AGF, 2019 WL 2285916, at *6 (E.D. Mo. May 29, 2019)[2] (quoting *Nail v. Husch Blackwell Sanders, LLP*, 436 S.W.3d 556, 562 (Mo. 2014)) (applying Missouri law); *e.g.*, *PPW Royalty Trust ex rel. Petrie v. Barton*, 841 F.3d 746, 753–54 (8th Cir. 2016).  "By proving that the result of the underlying proceeding would have been different 'but for' the attorney's negligence, the plaintiff also proves that the damages—the difference between what the result *would have been* and what it *was*—were the reasonable and probable consequence of the defendant's negligence."  *Beazley*, 2019 WL 2285916, at *6 (emphases in original) (quoting *Nail*, 436 S.W.3d at 562).

Here, the Court need only analyze the causation element—specifically the causation-in-fact (also called the case-within-a-case) requirement.  Importantly, "[t]he causal

---

[2] In its database, Westlaw reported this case name as *Beasley Insurance Co. v. Brown & James, P.C.  See Beazley*, 2019 WL 2285916, at *1.  Lexis, on the other hand, reported the case name as *Beazley Insurance Co. v. Brown & James, P.C.  See Beazley Ins. Co., Inc. v. Brown & James, P.C.*, No. 4:18-cv-01689-AGF, 2019 U.S. Dist. LEXIS 89571, at *1 (E.D. Mo. May 29, 2019).  Pursuant to the Court's official docket for the case, the correct name of the named plaintiff is Beazley Insurance Company, Inc.  Therefore, when citing to the decision in this memorandum and order, the Court uses the correct spelling—Beazley, with a "z."

14

connection cannot be based on speculation or conjecture." *Beazley*, 2019 WL 2285916, at *6 (alteration in original) (quoting *Nail*, 436 S.W.3d at 563). Instead, the claimant must "set forth facts suggesting" how he or she "would have been successful" absent "the attorney's misconduct." *Cain v. Hershewe*, 760 S.W.2d 146, 149 (Mo. Ct. App. 1988) (citation omitted); *see also, e.g.*, *Boatright v. Shaw*, 804 S.W.2d 795, 796 (Mo. Ct. App. 1990) (affirming lower court's decision granting motion to dismiss a legal-malpractice claim because the plaintiff "did not plead" an "essential element, i.e. 'that but for defendant's conduct,'" the plaintiff "would have been successful in the prosecution of [his] claim" (alteration in original)); *Pool v. Burlison*, 736 S.W.2d 485, 486 (Mo. Ct. App. 1987) (explaining that the plaintiff's "bare assertion," relying on the success of a different plaintiff who raised a similar issue in an unrelated case, did not amount to "a sufficient allegation that plaintiff would eventually be successful in his underlying action"); *Healing Chair, Inc. v. Logan Logan & Watson*, No. 4:22-cv-00327-SRW, 2023 WL 183829, at *7 (E.D. Mo. Jan. 13, 2023) (granting motion to dismiss on legal-malpractice claim because the plaintiff "d[id] not allege what [d]efendants or new counsel could have done differently or how these differences would have impacted the outcome").

The Harbisons' cursory allegation that, absent Rakusin's shortcomings, they "would not have incurred such significant attorneys' fees and legal costs and could have prevailed on their defenses or reached a reasonable settlement much earlier in" their lawsuits, doc. 85 at ¶ 37, does not demonstrate how they "would have been successful" in the lawsuits against them, *Cain*, 760 S.W.2d at 149 (citation omitted). Nor do the Harbisons' speculative allegations set forth "the difference between what the result would have been and what it was." *Beazley*, 2019 WL 2285916, at *6 (emphases omitted) (quoting *Nail*, 436 S.W.3d at 562). In a nutshell, the Harbsions put no meat on the causation bone. *See* doc. 85 at ¶ 37. Instead, they merely grazed

15

over any allegations that alternative decision-making would "have changed the outcome" in their underlying litigation.  *Barton*, 841 F.3d at 753–54 (reasoning that "the district court determined that the" plaintiffs "failed to allege adequately that the attorneys were negligent or that the outcome of" their underlying dispute "would have been different if the attorneys had raised any of the theories identified by the" plaintiffs "in their complaint").

And while the parties spent a significant portion of their briefing disputing the linguistic differences between "would be" and "could be," *see* doc. 87 at 9–12; doc. 88 at 7–8, the Harbisons' allegations relating to causation in fact set forth nothing more than "speculation" and "conjecture," *Beazley*, 2019 WL 2285916, at *6 (quoting *Nail*, 436 S.W.3d at 563).  As Litigation Lawyers posited, the Harbisons "fail[ed] to allege . . . any facts to support the notion that the" terms of the subsequently reached settlement, "or better, . . . were available and would have been agreed to by the other parties" in the lawsuits against the Harbisons "when [Rakusin] represented them."  Doc. 87 at 11 n.1.  Likewise, the Harbisons did not cite "to any authority holding that they can assert a legal malpractice claim based on alleged failure to settle a case on specific terms without alleging what those terms would have been or that the failure to obtain a settlement on those unalleged terms was caused by" Rakusin.  Doc. 91 at 6 n.2.

Moreover, the Harbisons' *post-hoc* rationalizations that, "[a]fter new counsel was retained," the lawsuits against them were "resolved via reasonable settlement negotiations in less than one year," doc. 85 at ¶ 28, do not rise to the level of "plausibly alleg[ing] that," but for Rakusin's alleged transgressions, the Harbisons "would have obtained a better"—or even the same—"outcome," *Beazley*, 2019 WL 2285916, at *8.  Thus, the Harbisons failed to sufficiently plead the causation element of a legal-malpractice claim; therefore, the Court dismisses their legal-malpractice claim.

16

### C. Breach-of-fiduciary-duty claim

As an initial matter, Litigation Lawyers argued that the Court must, in one fell swoop, dismiss the Harbisons' remaining claims—breach of fiduciary duty; breach of the implied covenant of good faith and fair dealing; and unjust enrichment—because "they are each subsumed by" the legal-malpractice claim.  Doc. 87 at 5.  But for the reasons analyzed above, *supra* Section III.B, the Harbisons failed to sufficiently plead their claim for legal malpractice; therefore, the Court need not wade into the fray of the subsumption issue.

Also, while the parties did not argue whether that specific issue is substantive or procedural, the Court assumes (without deciding) that the issue is substantive due to the nature of the issue and therefore applies Missouri law to both (i) dismiss the legal-malpractice claim and (ii) decline to weigh in on the subsumption issue.

It is axiomatic that, without a claim for legal malpractice in this case, the Court must go on and analyze the sufficiency of the Harbisons' remaining breach-of-fiduciary-duty claim.  *See also Beazley*, 2019 WL 2285916, at *6–*9 (granting motion to dismiss a legal-malpractice claim and then analyzing the sufficiency of breach-of-fiduciary-duty and unjust-enrichment claims); *Oetting v. Green Jacobson, P.C.*, No. 4:13-CV-1148 (CEJ), 2014 WL 942952, at *2–*3 (E.D. Mo. Mar. 11, 2014) (dismissing legal-malpractice claim at the motion-to-dismiss stage and then analyzing the viability of the remaining breach-of-fiduciary-duty claim).

The Harbisons alleged that Rakusin "engag[ed] in disloyal and self-serving conduct that placed" Litigation Lawyers's "interests above" the Harbisons' interests.  Doc. 85 at ¶ 41.  Likewise, "Rakusin did not exhibit undivided loyalty to the Harbisons and disregarded the[ir] interests and goals in the" underlying lawsuits against them "in order to prolong litigation and increase" Litigation Lawyers's "compensation."  *Id.* at ¶ 42.  This conduct, the Harbisons

alleged, amounted to a breach of Rakusin's fiduciary duty. *Id.* at ¶¶ 38–44; *see also* doc. 88 at 5. The Harbisons also made clear that "the support for the[ir]" breach-of-fiduciary-duty claim "relies on . . . circumstances that focus on loyalty[,] not Rakusin's duty of care or contractual obligations." Doc. 88 at 5 (emphasis omitted).

In response, Litigation Lawyers argued that the Court must dismiss the claim for two reasons. First, the Harbisons "fail[ed] to allege facts, beyond legal conclusions, as to how their purported damages – the alleged 'significant attorneys' fees and legals costs in the Underlying Litigation – were caused by" Litigation Lawyers's "alleged 'disloyal and self-serving conduct.'" Doc. 87 at 12 (quoting doc. 85 at ¶¶ 41–43). And second, the Harbisons "fail[ed] to allege the existence of damages." Doc. 86 at ¶ 7.

Under Missouri law, a breach-of-fiduciary-duty claim against an attorney contains five elements: "(1) an attorney-client relationship; (2) breach of a fiduciary obligation by the attorney; (3) proximate causation; (4) damages to the client; (5) no other recognized tort encompasses the facts alleged." *Klemme*, 941 S.W.2d at 496. In their briefing, the parties zero in on the causation and damages elements. *See* doc. 86 at ¶ 7; doc. 87 at 12–13; doc. 88 at 8–9; doc. 91 at 6–7. But as the Court sees it, taking "as true the" Harbisons' "factual allegations" in their amended counterclaims "and grant[ing] all reasonable inferences in" their "favor," the Harbisons satisfy each of the five elements of a breach-of-fiduciary-duty claim.

As for the first element, the Harbisons alleged that they "entered into an attorney-client relationship" with Rakusin, doc. 85 at ¶ 39—an allegation that Litigation Lawyers does not dispute, *see* doc. 87 at 3 ("The[]" Harbisons "hired" Rakusin, "pursuant to an engagement agreement.").

18

Second, the Harbisons asserted numerous allegations of Rakusin's purported breach: (i) he "engaged in ineffective motion practice, pursued legal actions contrary to established precedent, and other improper actions that unnecessarily prolonged litigation," doc. 85 at ¶ 19; (ii) he, throughout the "entire representation of the Harbisons," did "not prepare and implement a reasonable settlement strategy, provide advice to the Harbisons about the prospects of a negotiated settlement, or even mention the potential benefits of a settlement," *id.* at ¶ 21; (iii) he engaged "in disloyal and self-serving conduct that placed" Litigation Lawyers's "interests above those of the Harbisons," *id.* at ¶ 41; (iv) he "pursued costly and unnecessary litigation and invoiced over $1 million in legal fees when doing so was not necessary or appropriate," *id.* at ¶ 23; and (v) he "did not bill for 'necessary' legal actions but instead routinely billed for excessive and unnecessary legal actions," including "billing a total of 371.91 hours" for work completed in an uninterrupted "31-day span," *id.* at ¶ 25. Thus, at this stage of the case, the Harbisons satisfied facial plausibility of the breach element. *See Iqbal*, 556 U.S. at 678.

As for the third element, the Harbisons sufficiently alleged proximate causation: "As a direct result of Rakusin's breach of his fiduciary duty, the Harbisons incurred significant attorneys' fees and legal costs in" their underlying litigation "and retained replacement counsel at their own expense." Doc. 85 at ¶ 43. Further, the Harbisons alleged that, in one instance in the underlying suits, "Rakusin's litigation tactics caused" an opposing party "to incur over $2 million in attorneys' fees . . . for which it sought recovery from the Harbisons." *Id.* at ¶ 24. Based on these allegations, the Court reasonably infers that the Harbisons incurred legal fees (and therefore damages) in defending against the claim for over $2 million in legal fees. And so the Harbisons, consequently, plausibly pleaded that they "incurred significant attorneys' fees and legal costs . . . to remediate the damage caused by Rakusin." *Id.* at ¶ 36.

19

Fourth, if the allegations recited here were not enough to satisfy the damages element (which the Court finds that they do), the Harbisons also alleged that, while they paid Rakusin "approximately $695,000" at the time of his termination, *id.* at ¶ 27, they remain stuck with "significant attorneys' fees and legal costs" from their underlying lawsuits, *id.* at ¶ 43. And as for the fifth element, the Harbisons alleged that "[n]o other recognized causes of action encompass the facts as alleged" in their breach-of-fiduciary-duty claim. *Id.* at ¶ 44. Consequently, the Court determines that the Harbisons have "alleged facts that constitute the tort of breach of fiduciary duty . . . against" their "attorney," Rakusin, and, therefore, stated a breach-of-fiduciary-duty claim. *Klemme*, 941 S.W.2d at 496.

## IV.  Conclusion

Accordingly, the Court grants in part, denies in part, and holds in abeyance in part Litigation Lawyers's [86] Motion to Dismiss Amended Counterclaims. Specifically, the Court (1) dismisses the Harbisons' amended counterclaim for legal malpractice and (2) does not dismiss the Harbisons' claim for breach of fiduciary duty. A separate order of partial dismissal accompanies this memorandum and order. Doc. 102. The Court also, pending the parties' responses to its contemporaneously issued order, doc. 103, holds in abeyance its ruling on the motion as it relates to the Harbisons' claims for breach of the implied covenant of good faith and fair dealing and unjust enrichment.

So ordered this 2nd day of July 2025.

_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE