UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| LITIGATION LAWYERS, PROFESSIONAL ASSOCIATION, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 4:24-cv-00793-SRC |
| CHRISTOPHER HARBISON and REGINA HARBISON, | ) | |
| Defendants. | ) | |

**Memorandum and Order**

Like spawning salmon, litigation that dies often begets more litigation. Litigation Lawyers unsurprisingly resorts to, well, litigation to recover a six-figure legal bill from its former clients. Having hired Litigation Lawyers to defend loan-collection actions by a formerly friendly but now bellicose bank, the Harbisons both defend and counterclaim by accusing Litigation Lawyers of breaching various duties, overbilling, and acting in bad faith.

After a long and tortured history, including that the Harbisons have cycled through three law firms as counsel in this case, the parties' fee dispute has turned into a morass of dueling motions. Before the Court now are the Harbisons' motion for judgment on the pleadings, doc. 193; Litigation Lawyers' motion to strike expert opinions, doc. 195; and Litigation Lawyers' motion for summary judgment, doc. 197. As explained below, the Court shepherds this litigation nearer to its final resting place.

## I. Background

### A. Factual background

The Court finds the following facts undisputed for summary-judgment purposes.

The Harbisons, who managed more than forty business entities, doc. 186-1 at 4; doc. 206-1 at 4, took out roughly $5 million of loans from Patriots Bank for four of their businesses, doc. 208-2 at ¶¶ 145, 148, 157, 166, 171, 172. When the Harbisons stopped making loan payments, the Harbisons and the Bank attempted to negotiate a deal before turning to litigation. *Id.* at ¶¶ 55–74. The Harbisons considered refinancing their loans, and the Bank offered the Harbisons a forbearance agreement that would allow them sixty days to refinance. Doc. 201-5 at 33–45. The Bank gave the Harbisons a deadline of June 25, 2021, to accept the terms. Doc. 218 at ¶ 71. The day before the Bank's deadline, Regina Harbison rejected the Bank's offer, telling the attorney who was then representing the Harbisons, "I'm over [the Bank's] unprofessional responses. We will be moving forward today, doing what is in our best interest. I have no other responses to them or their 'agreement[.]'" Doc. 201-5 at 46. The next day, she wrote to her attorney, "I think this is over, obviously we can't do what they want . . . ." *Id.* at 50; *see* doc. 218 at ¶ 67.

Later the same day, the Bank's lawyers told the Harbisons' lawyer that the Harbisons' refusal to "give a general release of claims" was likely "fatal" to the chances of finalizing a forbearance agreement. Doc. 201-5 at 51. The parties did not reach an agreement, and the Bank brought suit in Missouri state court a few weeks later. *Id.* at 57–73. The Harbisons do not contend that they continued trying to refinance the Bank's loans after rejecting the Bank's forbearance agreement, nor do they contend that they made any attempts at refinancing during Litigation Lawyers' representation. *See* doc. 186-1; doc. 219.

The Bank sued the Harbisons and several of their business entities in Missouri state court and in this court, seeking damages and the appointment of a receiver. Doc. 186-1 at 1; *see* *Patriots Bank v. Black River Motel, LLC*, No. 21WA-CC00250 (Mo. Cir. Ct. filed July 7, 2021);

*Patriots Bank v. Harbison*, No. 4:21-cv-00991-HEA (E.D. Mo. filed Aug. 9, 2021). In August 2021, the Harbisons consulted Rae Mosier, Christerphor Harbison's cousin who also was a Florida attorney, about the Bank's lawsuits. Doc. 186-1 at 2; doc. 218 at ¶¶ 20–22, 25. Mosier referred the Harbisons to Litigation Lawyers and the Harbisons asked Mosier to solicit Litigation Lawyers' services because attorney Stephen Rakusin—Litigation Lawyers' president—had "familiarity with receivership litigation and collection defense." Doc. 218 at ¶¶ 21–22, 25. Litigation Lawyers was a Florida-based firm, and Rakusin was a Florida-licensed attorney who had "[n]ever been a member of the Missouri Bar" nor "ever been licensed to practice law in the state of Missouri. *Id.* at ¶¶ 2–3. Nonetheless, the Harbisons hired Litigation Lawyers to represent them and signed a contract with Litigation Lawyers. Doc. 7-2 at 12–18.

Aside from the state and federal lawsuits by the Bank, the agreement extended to "all matters in the future or hereafter handled for the [Harbisons] on an hourly or fixed basis." Doc. 7-2 at 12. The agreement provided for an hourly rate of $480 for Rakusin's legal services and $180 for Litigation Lawyers' paralegal. *Id.* at 12, 18; doc. 186-1 at 1; doc. 218 at ¶ 34. Litigation Lawyers would "provide periodic billings . . . itemiz[ing] the time spent," and the Harbisons "agree[d] to carefully read all billing statements and promptly notify [Litigation Lawyers], in writing, of any claimed errors or discrepancies, within fifteen (15) days from the date of the statement." Doc. 7-2 at 13. In Paragraph 5, Litigation Lawyers "agree[d] to cooperate in the prosecution of [the cases] in a manner most consistent with [the Harbisons'] goals, including cost efficiency." *Id.* Paragraph 10 provided that Litigation Lawyers did "not warrant any particular result in the litigation, [did] not warrant that the services can be performed at any particular cost no[r] within any particular period of time." *Id.* at 14.

Either party could terminate the agreement "at any time in writing." *Id.* at 15. The agreement notified the Harbisons that the Florida Bar had brought a pending disciplinary proceeding against Rakusin. *Id.* In that proceeding, the Florida Bar accused Rakusin (1) of inserting a provision in a fee agreement (unrelated to the agreement in this case) that allowed him to dismiss the client's case if the client did not pay Rakusin's bills within 10 days, (2) of managing a client's case during a suspension of Rakusin's law license, (3) making unfounded accusations that a judge engaged in *ex parte* communications with another judge, and (4) misrepresenting a canon of the Code of Judicial Conduct. Doc. 219-4 at 3–4, 8–12, 22.

Litigation Lawyers represented the Harbisons in the Bank's state and federal lawsuits, as well as several related matters, from August 2021 to January 2023. Doc. 186-1 at 2. The Harbisons told Rakusin that they used to have a close relationship with the Bank and Scott Cooper, the Bank's president, doc. 218 at ¶ 447, but that the relationship had soured to the point where the Bank "want[ed] to destroy [them]," *id.* at ¶¶ 77–78. The parties agree that, at the outset of the underlying litigation, the litigation "did not have any immediate settlement prospects" because the Harbisons believed that the Bank's demands were "unreasonable, could not be readily complied with, and were unacceptable." *Id.* at ¶ 75. And the Bank "did not extend any settlement offer to the Harbisons during the entirety" of Litigation Lawyers' representation. Doc. 186-1 at 3.

Throughout the underlying litigation, the Harbisons remained actively involved with Litigation Lawyers' work, sending over 1,000 emails to and having over 350 phone calls with Litigation Lawyers. *Id.* at 2. Litigation Lawyers routinely sent draft motions, objections, letters, and the like to the Harbisons, asking for input and approval. Doc. 205-5 at 17, 19–20; doc. 205-8 at 16, 19–25, 150–53, 159–63, 215, 217–19; *see* doc. 218 at ¶¶ 82, 88–89, 92, 95, 213, 217,

220, 239, 292, 341, 353, 404, 447, 503–04. Regina Harbison often left extensive comments on Litigation Lawyers' drafts and on the Bank's and receiver's filings. *See* doc. 202-3 at 69–72, 115–46; doc. 202-6 at 3–19, 36–59, 97–130; doc. 218 at ¶¶ 116–17, 237.

During the period that Litigation Lawyers represented the Harbisons, Litigation Lawyers sent Harbisons bimonthly invoices and billing statements. Doc. 7-2 at 22–145; doc. 186-1 at 3–4. The Harbisons fully paid the invoices before December 2021 but only partially paid later invoices, ultimately leaving $469,772.04 unpaid. Doc. 186-1 at 4. The Harbisons never objected to the invoices and billing statements. *Id.*; *see generally* doc. 219.

When Litigation Lawyers stopped representing the Harbisons in January 2023, doc. 186-1 at 2, the Harbisons were still litigating against the Bank, which brought a new federal suit in this court against the Harbisons and forty-four of their related business entities in March 2023. Doc. 186-1 at 4; doc. 206-1; *Patriots Bank v. Harbison*, No. 4:23-cv-00305-HEA (filed Mar. 10, 2023). The Bank asserted new alter-ego liability and single-enterprise theories, arguing that the Harbisons' business entities were "undercapitalized to avoid debts owed to creditors, including the Bank." Doc. 206-1 at ¶¶ 243–54. The Bank and the Harbisons eventually reached a settlement agreement that released the Harbisons from all of the Bank's and the receiver's claims against them. Doc. 186-1 at 4–20.

### B. Procedural background

In September 2023, Litigation Lawyers sued the Harbisons for breach of contract in Florida state court. Doc. 7-2. The Harbisons removed the case to the United States District Court for the Southern District of Florida, doc. 1, which then transferred the case to the Eastern District of Missouri, doc. 47. Litigation Lawyers filed a medley of motions to dismiss counterclaims and to strike the Harbisons' answer, and, after a status conference, the Court

granted leave for the Harbisons to amend their answer. Doc. 84; *see* docs. 68, 70, 72, 77, 81. In their amended answer to the complaint, the Harbisons raised affirmative defenses and counterclaimed for legal malpractice, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. Doc. 85 at 18–22. The Court previously dismissed the Harbisons' legal-malpractice and unjust-enrichment counterclaims. Doc. 101 at 16; doc. 106 at 7. The Court also found that Missouri substantive law governs the breach-of-fiduciary duty counterclaim, doc. 101 at 9–10, and that, because the parties entered into the agreement in Florida, Florida substantive law governs the claim for breach of the implied covenant of good faith and fair dealing, doc. 106 at 1–2.

The day before the deadline for filing dispositive motions, *see* doc. 185—and 247 days after the deadline to amend pleadings, *see* doc. 113 at 1—the Harbisons moved for leave to file a second amended answer, asserting that, under Federal Rule of Civil Procedure 9(a)(2), Litigation Lawyers lacked capacity to maintain its suit because it "chang[ed] both its corporate name and corporate form," doc. 191 at ¶ 5; doc. 191-2 at 1, 14. The Court found that the information relating to Litigation Lawyers' change of corporate form had been publicly available for 342 days before the deadline to amend pleadings, which itself was 247 days before the Harbisons filed their motion. Doc. 210 at 3. Moreover, Litigation Lawyers' conversion had come up at a May 2026 status conference, but "the Harbisons then waited over a month" before filing their motion for leave to file a second amended answer. *Id.* (citing doc. 189). Because the Harbisons did not show good cause warranting such a late amendment to their answer based on information that had been publicly available for 589 days before the Harbisons' motion, the Court denied their motion. *Id.* at 3–4. Four days after the Court denied the Harbisons' motion for leave to

amend, the Harbisons filed a notice of supplemental authority in support of their lack-of-capacity argument. Doc. 211.

The Court now rules on three pending motions. First, the Harbisons move for judgment on the pleadings, asking the Court to enter judgment "[b]ecause Florida law does not presently authorize [Litigation Lawyers] to maintain this action," meaning that, under Federal Rule of Civil Procedure 9(a)(2), Litigation Lawyers lacks capacity to sue. Doc. 193 at 5. Second, Litigation Lawyers moves to strike the expert opinions of Henry F. Luepke, III. Doc. 195. Third, Litigation Lawyers moves for summary judgment on its breach-of-contract claim and the Harbisons' fiduciary-duty and good-faith-and-fair-dealing counterclaims. Doc. 197.

## II. The Harbisons' motion for judgment on the pleadings

### A. Standard

As explained below, the Court construes the Harbisons' motion for judgment on the pleadings as a motion for summary judgment and therefore lays out the summary judgment rather than the Rule 12 standard for motions for judgment on the pleadings.

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the Court is required to view the evidence in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the initial burden of showing both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 & n.4 (1986); Fed. R. Civ. P. 56(a). A dispute of material fact is "genuine" if "a

reasonable jury could return a verdict for either party." *Morrow v. United States*, 47 F.4th 700, 704 (8th Cir. 2022) (quoting *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995)).

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Self-serving, conclusory statements without support are insufficient to defeat summary judgment. *Armour & Co., Inc. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**B. Discussion**

The Harbisons filed their motion for judgment on the pleadings before the Court denied their motion for leave to file a second amended answer. Docs. 191, 193, 210. Now the Harbisons base their motion for judgment on the pleadings on Litigation Lawyers' supposed lack of capacity to sue because "Florida law does not authorize [Litigation Lawyers] to maintain this action through the authority [Litigation Lawyers] now attributes to Rakusin," doc. 194 at 1, who was disbarred in May 2023, doc. 219-3. Because the Court denied the Harbisons leave to amend their answer to add a lack-of-capacity defense, the Harbisons' motion—based on a defense not raised in the pleadings—cannot be properly characterized as "on the pleadings," and the Court construes it as a motion for summary judgment under Federal Rule of Civil Procedure 12(d). Fed. R. Civ. P. 12(d) ("If, on a motion under . . . 12(c), matters outside the pleadings are

presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.”). But however characterized, the motion has no merit.

Federal Rule of Civil Procedure 9(a)(2) provides that a party “must” plead an opposing party’s capacity to sue or be sued “by a specific denial.” Failing to raise the defense in a pleading waives the defense. *See* Fed. R. Civ. P. 12(b) (requiring that defenses be asserted in responsive pleadings); *First Union Nat’l Bank ex rel. Se. Timber Leasing Statutory Tr. v. Pictet Overseas Tr. Corp.*, 351 F.3d 810, 815 (8th Cir. 2003) (finding that a plaintiff had waived a capacity defense by “defend[ing] a counterclaim on the merits and fail[ing] to proffer a ‘different capacity’ defense” (citations omitted)); 5A *Wright & Miller’s Federal Practice and Procedure* § 1295 (4th ed. 2026) (“[C]ourts tend to treat an objection to a party’s capacity, authority, or legal existence as akin to an affirmative defense that is treated as waived if not asserted by motion or responsive pleading or in an appropriate amendment. Such early waiver is necessary to give meaning to the requirement in Rule 9(a) that these matters must be put in issue by a ‘specific denial.’” (footnotes omitted)); *Davis v. Buchanan County*, No. 5:17-cv-06058-NKL, 2019 WL 7116363, at *5 (W.D. Mo. Dec. 23, 2019) (finding that the defendants had waived a capacity defense asserted in response to an amended complaint after “they s[a]t on their hands for ten months” before asserting the defense). Because the Harbisons’ operative answer, doc. 85, does not specifically deny Litigation Lawyers’ capacity to sue, as required by Federal Rule of Civil Procedure 9(a)(2), the Harbisons have waived this defense, and it does not provide a basis to grant the Harbisons’ motion for judgment on the pleadings.

The Harbisons resist this conclusion. After the Court denied their motion for leave to file a second amended answer, the Harbisons filed a notice of supplemental authority in support of their motion for judgment on the pleadings. Doc. 211. The Harbisons do not challenge the

Court's denial of their motion for leave to file a second amended answer. *See* doc. 211 at 1 ("[The Harbisons] do not seek reconsideration of the Court's Order denying leave to amend."). Instead, they argued that "a federal district court possesses inherent authority, independent of Federal Rule of Civil Procedure 9(a), to determine whether the individual directing litigation on behalf of the named Plaintiff possesses lawful authority to do so." Doc. 211 at 1. According to the Harbisons, the "principal authority" underlying the Court's inherent authority to sua sponte invoke a party's lack of capacity to sue is *Pueblo of Santa Rosa v. Fall*, 273 U.S. 315 (1927). There, the Supreme Court explained that "the trial court . . . has power, at any stage of the case, to require an attorney, one of its officers, to show his authority to appear." *Id.* at 319. The Court affirmed the dismissal of a suit because an attorney had tried to bring suit even though he "lack[ed] . . . authority from" the client to bring the suit. *Id.* at 319–20.

The Harbisons point also to *Doraleh Container Terminal SA v. Republic of Djibouti*, in which the D.C. Circuit noted that "[c]hallenges to a lawyer's authority . . . may be raised 'at any stage of the case.'" 109 F.4th 608, 615 (D.C. Cir. 2024) (quoting *Pueblo of Santa Rosa*, 273 U.S. at 319)). The court remanded to the district court to determine counsel's authority to represent the client, holding that "courts presented with evidence raising substantial questions about a lawyer's authority should determine whether the party authorized the lawyer's representation." *Id*. at 619.

*Pueblo of Santa Rosa* and *Doraleh Container Terminal* have no bearing on the facts of this case. The Harbisons' argument depends entirely on an equivocation about the meaning of the word "attorney" in those cases. Yes, Rakusin is an attorney. But that is not his role in this suit. *Pueblo of Santa Rosa* and *Doraleh Container Terminal* focused solely on attorneys' authority to represent their clients, not on the authority to perform a managerial role within an

organization. *See Pueblo of Santa Rosa*, 273 U.S. at 319–20; *Doraleh Container Terminal*, 109 F.4th at 617. The equivalent relationship here is not the relationship between Rakusin and Litigation Lawyers; it is the relationship between Litigation Lawyers and the counsel representing it in this action. And the Harbisons do not even attempt to argue that the attorneys who represent Litigation Lawyers in this suit lack the authority to do so.

Because the Harbisons waived their lack-of-capacity argument by not raising it in their operative pleading and because the Harbisons cite no authority suggesting that the Court can *sua sponte* raise Litigation Lawyers' supposed lack of capacity to sue, the Court denies the Harbisons' motion for judgment on the pleadings. Doc. 193.

## III. Litigation Lawyers' Rule 702 motion

Before the Court moves to the summary-judgment motion, it must first resolve Litigation Lawyers' Motion to Strike or Exclude the Expert Opinions of Henry F. Luepke, III. Doc. 193. Luepke is a "licensed and practicing attorney in good standing with the Missouri Bar" who has "worked in civil litigation" since 1991. Doc. 219-2 at 1. The Harbisons retained Luepke "to conduct an independent analysis of the fees" Litigation Lawyers charged. *Id.* While Litigation Lawyers makes passing references that this is Luepke's first opinion-testimony engagement, *see* doc. 195 at ¶ 2; doc. 196 at 1, it does not challenge Luepke's extensive qualifications, instead challenging only his opinions and methodology, *see generally* docs. 195, 196.

### A. Standard

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court interpreted the then-effective version of Federal Rule of Evidence 702 to require district courts to verify that expert evidence is "not only relevant, but reliable." 509 U.S. 579, 589 (1993). The district court must make a "preliminary assessment of whether the reasoning or methodology underlying the

testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93.

Post-*Daubert* amendments to Rule 702, including the most-recent amendments in 2023, clarify the standard:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702 (2023). The expert witness's proponent must show that the testimony satisfies Rule 702's elements by a preponderance of the evidence. *Id.*; *Sprafka v. Med. Device Bus. Servs., Inc.*, 139 F.4th 656, 660 (8th Cir. 2025) (citing to the Advisory Committee's note to the 2023 amendments to Rule 702); *see also Bliv, Inc. v. Charter Oak Fire Ins. Co.*, 159 F.4th 539, 542 (8th Cir. 2025) (relying on *Sprafka*). And the Court—not the jury—decides whether the proponent bore its burden. *See Sprafka*, 139 F.4th at 660 n.3 (citing the Advisory Committee's note to the 2023 amendments to Rule 702).

Under Rule 702, the Court has "a gatekeeping role to assure that evidence admitted in a case is both relevant and reliable." *Sprafka*, 139 F.4th at 660–61. And while Rule 702 "calls for a flexible inquiry," the Court must "discern expert opinion evidence based on good grounds from subjective speculation that masquerades as scientific knowledge." *Bliv*, 159 F.4th at 543 (citations omitted).

This Court applies both the currently applicable version of Rule 702 and current Eighth Circuit precedent. *See Sprafka*, 139 F.4th at 660 n.3. The Court further notes that the 2023 amendments clarified the gatekeeping role of district courts but did not work wholesale changes to Rule 702; thus, district courts must carefully analyze pre-amendment caselaw to determine whether it remains good law post amendment. *See Sprafka*, 139 F.4th at 660 n.3 (citing to the Advisory Committee's notes); *see also Bliv*, 159 F.4th at 542 (relying on *Sprafka*); *cf. Crabar/GBF, Inc. v. Wright*, 142 F.4th 576, 587 n.7 (8th Cir. 2025). Accordingly, when the Court cites pre-amendment caselaw, it does so only after careful consideration of its post-amendment validity. The Court now turns to the merits of Litigation Lawyers' Rule 702 motion.

**B. Discussion**

Litigation Lawyers classifies the opinions in Luepke's report into four groups: (1) his opinions related to feasibility of settling the underlying litigation earlier (2) his opinions that Litigation Lawyers litigated and billed excessively for unnecessary legal work, (3) his opinions that Litigation Lawyers breached duties owed to the Harbisons, and (4) his opinions on Rakusin's disciplinary proceedings. Doc. 195 at ¶ 7; doc. 196 at 1. The Court addresses these groups in turn.

Litigation Lawyers first objects to Luepke's opinions about the feasibility of settlement during Litigation Lawyers' representation of the Harbisons and, relatedly, that settlement was the Harbisons' goal. Doc. 196 at 3–9. These opinions include that "the pre-litigation history and [the] successful efforts [of the attorneys who took over representation of the Harbisons after Litigation Lawyers] demonstrate that a reasonable settlement was available and could have been achieved early on in the [underlying litigation]," doc. 219-2 at 11; "[t]he factual record supplied indicates that the Harbisons' practical objective was to resolve the Bank's claims (via refinancing or settlement) rather than to pursue protracted litigation," *id.* at 8; that "[t]he

Harbisons believed the prospect of refinancing looked promising," *id.*; and that "the Harbisons' express objective [was to] resolv[e] the Patriots Bank Cases through refinancing/settlement," *id.* at 11. According to Litigation Lawyers, "Luepke's opinion is based on the unsubstantiated and conjectural assumption that the same (or a better) settlement reached in December 2023 could have been reached before LLPA withdrew from representation." Doc. 193 at 3.

The Court agrees. First, Luepke's legal experience, while extensive, gives him no "specialized knowledge" about whether the specific parties involved in the underlying litigation would have been willing or able to reach a settlement while Litigation Lawyers was representing the Harbisons, nor about whether the Harbisons were hoping to settle the underlying litigation. Fed. R. Evid. 702(a). Luepke concedes that "not all civil cases settle" and that "each case has unique characteristics and parties with distinct objectives and viewpoints." Doc. 219-2 at 11. The Court finds that the Harbisons have not shown that Luepke's opinions on these particular parties' willingness to settle and on the Harbisons' litigation goals would more likely than not "involve specialized knowledge" that would "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

The Court also finds Luepke's opinions lacking the required "sufficient facts or data," Fed. R. Evid. 702(b), to support his opinion "that a reasonable settlement was available and could have been achieved early on" in the underlying litigation, doc. 219-2 at 11. An earlier settlement would have worked only if both parties consented, and the evidence indicates that, after the initial attempts to negotiate a deal failed, neither party was interested in settling. The Harbisons admit that, roughly two months before they hired Litigation Lawyers, they rejected the Bank's last offer without making a counteroffer. Doc. 218 at ¶ 65; *see* doc. 201-5 at 46, 50–51. The Harbisons even acknowledge that the underlying "cases did not have any immediate

settlement prospects since the Harbisons advised Stephen Rakusin that the Bank's requirements and demands were unreasonable, could not be readily complied with, and were unacceptable." Doc. 218 at ¶ 75. And the parties agree that "[t]he Bank did not extend any settlement offer to the Harbisons during the entirety" of the time Litigation Lawyers represented the Harbisons. Doc. 186-1 at 3. Nor do the Harbisons contend that, after retaining Litigation Lawyers, they continued trying to refinance their loans to be able to reach an agreement with the Bank. *See* doc. 186-1; doc. 219.

Luepke points to the "pre-litigation history" (which went nowhere, doc. 201-5 at 46, 50–51) and the settlement at the end of 2023 (almost a year after Litigation Lawyers' representation ended, doc. 186-1 at 4–20), but he cites no evidence supporting the parties' willingness to settle during the time that Litigation Lawyers represented the Harbisons, *see* doc. 219-2 at 9, 11. His conclusion that settlement would have been feasible during that time is "subjective speculation." *Bliv, Inc.*, 159 F.4th at 543. The Harbisons have failed to show by a preponderance of the evidence that sufficient facts and data support Luepke's opinion about the feasibility of earlier settlement. *See* Fed. R. Evid. 702(b).

Luepke's opinions that the "Harbisons' practical objective was to resolve the Bank's claims (via refinancing or settlement) rather than to pursue protracted litigation" and that "[t]he Harbisons believed the prospect of refinancing looked promising" similarly lack support. Doc. 219-2 at 8. Luepke and the Harbisons identify no evidence suggesting that the Harbisons pursued or were interested in settlement or refinancing while Litigation Lawyers represented them.

To the contrary, the evidence shows the Harbisons' engagement in the litigation strategy Rakusin pursued. The Harbisons remained actively involved with Litigation Lawyers' work

throughout, sending over 1,000 emails to and having over 350 phone calls with Litigation Lawyers. Doc. 186-1 at 2. Litigation Lawyers routinely sent draft motions, objections, letters, and the like to the Harbisons asking for input and approval. Doc. 205-5 at 17, 19–20; doc. 205-8 at 16, 19–25, 150–53, 159–63, 215, 217–19; *see* doc. 218 at ¶¶ 82, 88–89, 92, 95, 213, 217, 220, 239, 292, 341, 353, 404, 447, 503–04. Regina Harbison often left extensive comments on Litigation Lawyers' drafts and on the Bank's and receiver's filings. *See* doc. 202-3 at 69–72, 115–46; doc. 202-6 at 3–19, 39–59, 100–30; doc. 218 at ¶¶ 116–17, 237.

Yet neither Luepke nor the Harbisons point to any evidence supporting their alleged objective or desire to settle, or to pursue a different strategy. *See generally* doc. 214. One would expect that if the Harbisons desired to settle, that—somewhere in their myriad communications with Litigation Lawyers—they would have, at a minimum, mentioned settlement, resolution, negotiation, mediation, or the like, and if not, that they'd have outright instructed Rakusin to pursue settlement. And the Court observes that their aggressive litigation strategy delayed the Bank's collection efforts by 16 months, and while the Harbisons incurred a substantial legal bill with Litigation Lawyers, the amounts the Bank sought to collect were nearly 500% greater than the legal fees the Harbisons incurred to buy themselves time. *See Patriots Bank*, No. 4:21-cv-00991-HEA, doc. 1 (E.D. Mo. Aug. 9, 2021); doc. 7-2 at 22–145. This contextualizes the absence of any evidence of the Harbisons' supposed desire to settle.

Litigation Lawyers next objects to a handful of Luepke's opinions about billing, including that Litigation Lawyers billed "an extraordinarily large amount" of hours and fees "in absolute terms for the described dispute," that Litigation Lawyers spent substantial time "on unsuccessful and repetitive procedures," and that Litigation Lawyers billed disproportionate to the novelty and difficulty of the case and the "routine commercial litigation skill[s]" required.

Doc. 219-2 at 9–10; doc. 196 at 10–12. In particular, Litigation Lawyers objects to Luepke's ultimate conclusion that "reasonable litigation strategies . . . would likely have cost the Harbisons reasonable fees no more than between $200,000 and $500,000." Doc. 219-2 at 11.

For several reasons, Luepke's opinions do not cross the threshold required for admissibility. First, while Luepke asserts that "[t]he aggregate hours . . . and fees . . . billed in 16 months for these two collection/receivership matters are excessive and unreasonable," he identifies no specific actions of Litigation Lawyers that were unnecessary and excessive. Doc. 219-2 at 9, 11. Next, Luepke offers no calculation whatsoever about how many hours he claims Litigation Lawyers *should* have expended on the various tasks it performed for the Harbisons, or about which hours should not have been expended or which tasks should not have been performed. *See* doc. 219-2 at 8–11.

Rule 702 expressly requires that opinion testimony be "based on sufficient facts or data; . . . [be] the product of reliable principles and methods; and . . . reflect[] a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d). Because Luepke's opinions about overbilling lack underlying facts, and further lack articulated principles or methods, the Harbisons fail to show that Luepke's opinions are "expert opinion evidence based on good grounds" rather than "subjective speculation that masquerades as scientific knowledge." *Bliv, Inc.*, 159 F.4th at 543 (quoting *Ackerman v. U-Park, Inc.*, 951 F.3d 929, 933 (8th Cir. 2020)).

Luepke's conclusion that "reasonable litigation strategies . . . would likely have cost the Harbisons reasonable fees no more than between $200,000 and $500,000" similarly fail to cross the Rule 702 threshold. Doc. 219-2 at 11. Expert opinions must be "the product of reliable principles and methods." *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (quoting Fed. R. Evid. 702(c)). But here, Luepke's report does not articulate what principle or method he

used to reach the conclusion that $200,000 to $500,000 would have been a reasonable fee—an opinion that shows up, for the first time, in the final paragraph of Luepke's report. *See* doc. 219-2 at 11.

In defending Luepke's opinions about fees, the Harbisons rely exclusively on *Beckler v. Rent Recovery Solutions LLC*, 83 F.4th 693 (8th Cir. 2023). But *Beckler* has minimal to no application here; that case discussed the methods for calculating court awards of attorney's fees to a prevailing party. *See id.* at 694. A substantial distinction exists between fee-award cases like *Beckler* and fee-challenge cases like this one. In fee-award cases, the court determines how much the losing party should pay the winning party's lawyers. *See id.* at 694–95. The winning party's attorneys never have an attorney-client relationship, contract, or other agreement with the losing party. And the winning party had no ability to control how the opposing attorneys or parties litigated the case. In fee-challenge cases, the opposite is true: The parties had an attorney-client relationship, *see* doc. 186-1 at 1; the parties signed a contract or some other form of express or implied agreement, *id.*; the attorneys owed contractual and ethical duties to their clients, *see* doc. 7-2 at 12–18; and the clients had the ability to control their attorneys, *see* doc. 186-1 at 2. *Beckler* therefore does nothing to shore up the reliability of Luepke's fee opinions.

Second, the record indicates that Litigation Lawyers' various actions were done with the advice and consent of the clients; Luepke just assumes that the Harbisons were unaware of, didn't approve of, or were duped into approving the actions taken by Litigation Lawyers. The record demonstrates just the opposite. The parties agree that the Harbisons exercised significant oversight over the underlying litigation. Doc. 186-1 at 2 (stipulating that the Harbisons were "actively involved in their own defenses"); *id.* (stipulating that the Harbisons sent "more than 1,000 emails to, and had over 350 phone calls with," Litigation Lawyers); *id.* (stipulating that "[t]he Harbisons

participated in the preparation of pleadings, discovery and other court filings" during Litigation Lawyers' representation). For instance, Luepke criticizes Litigation Lawyers' "repeated efforts to defeat an appropriate receivership order" by moving to vacate the receiver's appointment. Doc. 219-2 at 9. But the parties agree that "[t]he Harbisons were consulted, approved and participated in the filing of the motion to vacate the receiver." Doc. 186-1 at 2. The evidence further indicates that Litigation Lawyers regularly sent drafts of motions, objections, and the like to the Harbisons for their approval, to which the Harbisons would often respond with comments. *See* doc. 202-3 at 69–72, 115–46; 202-6 at 2–19, 100–33; doc. 205-5 at 17, 19–20, 25; doc. 205-8 at 16, 19–25, 150–53, 159–63, 215, 217–19; doc. 218 at ¶¶ 82, 88–89, 92, 95, 116–17, 213, 217, 220, 237, 239, 292, 341, 353, 404, 447, 503–04.

Rather than contesting that the Harbisons actively managed the underlying litigation and approved Litigation Lawyers' filings, the Harbisons now argue that "[u]nsophisticated clients, especially those who are illiterate, are entitled to rely on their lawyers to recommend what strategy is in the client's best interests." Doc. 214 at 7. But the Harbisons point to nothing in the record suggesting that they were "unsophisticated" or "illiterate." The record contains multiple indications to the contrary. For instance, the 1,000 emails that the Harbisons sent Litigation Lawyers indicate that the Harbisons were actively monitoring and shaping the litigation. *See* doc. 186-1 at 2. On top of that, the record indicates that the Harbison's operated more than forty business entities, *id.* at 4; doc. 206-1 at 4, that the Harbisons took out roughly $5 million in loans for their business entities, doc. 208-2 at ¶¶ 145, 148, 157, 166, 172, and that the eventual settlement of the underlying litigation at the end of 2023 involved millions of dollars changing hands, *see* doc. 186-1 at 7.

The extensive comments that the Harbisons often left on Litigation Lawyers' draft motions and on the Bank's filings also do not indicate a lack of sophistication. Because the evidence does not indicate that the Harbisons were unsophisticated clients—much less illiterate—the Harbisons' opposition to Litigation Lawyers' motion to strike fails to show by a preponderance of the evidence that Luepke's opinions about Litigation Lawyers' supposedly excessive litigation and billing relied on sufficient facts and data, were based on reliable principles and methods, or involved a reliable application of those principles of methods. *See* Fed. R. Evid. 702(b)–(d).

Third, despite acknowledging that "each case has unique characteristics and parties with distinct objectives and viewpoints," Luepke ignores or performs only a perfunctory analysis of many important contextual features of the underlying litigation that bear on the fees charged. Luepke's report makes no mention of the Bank's litigation tactics or the extent to which they necessitated Litigation Lawyers' behavior. *See* doc. 219-2 at 1–11. Luepke includes almost no discussion of the claims or defenses from the underlying litigation—information that one would reasonably expect to form the foundation of any estimates about the appropriate amount of time to spend. Common sense shows that debtors are no strangers to dilatory litigation tactics, but Luepke never addresses the possibility that the underlying litigation stretched on because the Harbisons were intentionally trying to stave off an over $5 million liability to preserve their businesses. Nor does Luepke analyze the bad blood between the parties—another possible explanation for why the Harbisons might have wanted to litigate aggressively. *See* doc. 218 at ¶¶ 77–78 (describing how the parties' former good relationship had soured to a point where the Bank "want[ed] to destroy the Harbisons").

Luepke also fails to support his conclusion that the underlying litigation was "routine" and involved factual and legal issues that were "not novel or complex." Doc. 219-2 at 9. The evidence

again suggests otherwise: The underlying litigation involved multiple lawsuits relating to multiple loans to multiple entities with multiple guaranties. Doc. 218 at ¶¶ 18–19. Luepke also offers no analysis for his assertion that navigating the niche area of receivership law is "routine," citing no cases involving similar factual or legal issues. Doc. 219-2 at 9. Without analysis of the essential context of the underlying litigation, Luepke's opinions "overlooked critical information" and "failed to address important aspects" of the case, raising further admissibility concerns under Rule 702(b), (c), and (d). *Bliv, Inc.*, 159 F.4th at 544.

Furthermore, Luepke barely acknowledges that Litigation Lawyers was a Florida-based firm and Rakusin a Florida-licensed attorney. Doc. 218 at ¶ 2. As the Harbisons concede, Rakusin "has [n]ever been a member of the Missouri Bar" and "has not ever been licensed to practice law in the state of Missouri." *Id.* at ¶¶ 2–3. And the record contains no evidence regarding whether Litigation Lawyers or Rakusin had any particular experience with Missouri procedure or courts. The parties to the underlying litigation disputed whether Kansas or Missouri state law applied, *see Patriots Bank v. Harbison*, No. 4:21-cv-00991-HEA, doc. 130, at 4 n.1 (E.D. Mo. July 27, 2023); either way, the record contains no indication that Rakusin had any familiarity with Kansas or Missouri state law. The Court recognizes that lawyers frequently get admitted to state and federal courts in Missouri *pro hac vice*. But, at the same time, the Court recognizes that the Harbisons' decision—at the recommendation of a relative who was an attorney—to retain a lawyer who was neither licensed in nor familiar with the practices and procedures in Missouri courts nor familiar with the nuances of Kansas or Missouri state law would have a steeper hill to climb—and concomitantly expend more hours—learning the relevant laws, practices, and procedures. The Harbisons do not explain why they chose to retain a lawyer with expertise in a different state's

law, practices, and procedures, but they voluntarily assumed at least some of the added cost. But Luepke's report ignores this context as well.

The Court acknowledges that Litigation Lawyers billed a lot. But "a lot" is not necessarily "too much." Rule 702 requires more rigorous analysis than vague assertions unsupported by calculations, comparisons to billing in similar suits, or anything other than an unquestionably experienced lawyer's general sense of what charges would have been appropriate. The Court therefore finds that the Harbisons have failed to show, by a preponderance of the evidence, that Luepke's opinions about whether Litigation Lawyers litigated and billed excessively are "based on sufficient facts or data," are "the product of reliable principles and methods," and "reflect[] a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(c)–(d). Accordingly, the Court grants Litigation Lawyers' motion to exclude Luepke's opinions about Litigation Lawyers litigating and billing excessively.

Litigation Lawyers' third objection concerns Luepke's opinion that "[f]ailure to advise or to pursue settlement under these facts is contrary to Litigation Lawyers' duty to protect the Harbisons from unnecessary costs, fees, and delays and to act in their best interests." Doc. 219-2 at 9. Relatedly, Luepke concluded that "Litigation Lawyers' overall litigation strategy," which "prioritiz[ed] repeated adversarial motions, discovery fights, and appeals[,] . . . likely constituted a breach of its duty to advise and protect the Harbisons' economic interests." *Id.* at 11.

Luepke briefly mentions the fiduciary implications of Litigation Lawyers' litigation strategy. Doc. 219-2 at 9. But while he refers to Litigation Lawyers "duties to communicate with clients," "to act in the clients' best interests," and "to protect the Harbisons from unnecessary costs, fees, and delays," *id.* at 8–9, he does little to flesh out the source of these "duties" nor to explain the specific actions that Litigation Lawyers took or failed to take that

violated the duties. In describing the "[a]pplicable legal and ethical standards," he points only to Missouri Supreme Court Rule 4-1.5(a), which prohibits the charging of unreasonable fees, and to American Bar Association Model Rule 1.4, which requires that attorneys communicate reasonably with their clients. Doc. 219-2 at 8; *see* Mo. Sup. Ct. R. 4-1.5(a); Model Rules of Pro. Conduct r. 1.4 (A.B.A. 2026). But the only "breaches" that Luepke identifies seem to be that Litigation Lawyers did not try to settle earlier, litigated too aggressively, and billed too much, in his estimation. Doc. 219-2 at 8–11. As discussed above, the Court determined that Luepke's opinions about the viability of earlier settlement and about excessive litigation and billing are inadmissible under Rule 702. Because Luepke bases his opinions about Litigation Lawyers' supposed breach of duties on his inadmissible opinions related to settlement and billing, the Court finds that the Harbisons have once again failed to satisfy the requirements of Rule 702(b)–(d).

Finally, Litigation Lawyers objects to Luepke's opinions about Rakusin's disciplinary proceedings. Doc. 194 at 14–15. Luepke opined that "[t]he existence of an active disciplinary proceeding in Florida when Litigation Lawyers accepted [the] engagement, plus the subsequent disbarment for misconduct, is probative of unreasonably excessive services and fees." Doc. 219-2 at 10. Luepke went on to conclude that "Rakusin's pending disciplinary action for overcharging at the time of engagement and subsequent disbarment for misconduct, including overcharging, are probative of a pattern and support a conclusion that the services and fees were unreasonable, unwarranted, and were neither provided nor incurred in the best interests of the Harbisons." *Id.* at 11.

Contrary to Luepke's assertions that Rakusin's pending disciplinary action was "for overcharging" and that Rakusin was disbarred "for misconduct, including overcharging," *id.*, the

ethical violations discussed in the referee's report did not involve overcharging, *see* doc. 219-4. The referee discussed a provision in one of Rakusin's earlier fee agreements that authorized him to voluntarily dismiss a client's litigation if the client failed to pay his bills within ten days. Doc. 219-4 at 3–4. The referee also evaluated evidence suggesting that Rakusin (1) continued managing clients' cases during a suspension, (2) "leveled an unfounded accusation against [a judge] contending that he engaged in *ex parte* communications with another judge," and (3) misrepresented a canon of the Code of Judicial Conduct." *Id.* at 8–12. Based on that misconduct—not on overcharging—the referee recommended disbarring Rakusin, *id.* at 22, and the Florida Supreme Court adopted and implemented the referee's recommendation, doc. 219-3. "[E]xpert testimony that is . . . contrary to the facts of the case is inadmissible." *Bliv, Inc.*, 159 F.4th at 543 (quoting *Lancaster v. BNSF Ry. Co.*, 75 F.4th 967, 970 (8th Cir. 2023)). Luepke's opinions "overlooked critical information," *id.* at 544—the actual grounds of Rakusin's disciplinary proceeding and disbarment.

Aside from an inaccurate characterization of the nature of Rakusin's disciplinary proceedings, Luepke doesn't explain why misconduct unrelated to overcharging is "probative of a pattern and support[s] a conclusion that the services and fees were unreasonable [or] unwarranted." Doc. 219-2 at 11. In Rakusin's disciplinary proceedings, the referee and the Florida Supreme Court made no observations about Rakusin's previous billing being "unreasonable" or "unwarranted," docs. 219-3, 219-4, so it's unclear how the disciplinary proceedings could be "probative of a pattern" of excessive billing, *see* doc. 219-2 at 11. Without any explanation of the rationale underlying Luepke's opinion, Luepke's opinion about Rakusin's disciplinary proceedings do not pass muster under Rule 702(c) or (d). Because the Harbisons fail to show that Luepke's opinions about Rakusin's disciplinary proceedings more likely than not

satisfy the requirements of 702(b), (c), or (d), the Court grants Litigation Lawyers' motion to exclude Luepke's opinions about Rakusin's disciplinary proceedings. Doc. 219-4 at 10–11.

Accordingly, the Court grants Litigation Lawyers' Motion to Strike or Exclude the Expert Opinions of Henry F. Luepke, III. Doc. 193.

## IV. Litigation Lawyers' motion for summary judgment

### A. Standard

The Court applies the same summary judgment standard set forth above.

### B. Discussion

The Court already determined that Florida substantive law applies to the Harbisons' contractual counterclaims because "the parties entered into the retainer agreement in Florida." Doc. 106 at 1–2. For the same reason, Florida substantive law applies to Litigation Lawyers' breach-of-contract claim. *See Paquin v. Campbell*, 378 So. 3d 686, 690 (Fla. Dist. Ct. App. 2024) ("Florida has 'long adhered to the rule of lex loci contractus,' which is that the law of the state where the contract was executed governs the rights and liabilities of the parties to the contract." (quoting *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, 1163 (Fla. 2006))). The Court also determined that Missouri law applies to the Harbisons' breach-of-fiduciary-duty claim, which sounds in tort. Doc. 101 at 8.

#### 1. Breach-of-contract claim

"To prevail in a breach of contract action" under Florida law, "a plaintiff must prove: (1) a valid contract existed; (2) a material breach of the contract; and (3) damages." *Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949, 953 (Fla. Dist. Ct. App. 2017). Litigation Lawyers' breach-of-contract claim is straightforward. The parties entered into a retainer agreement. Doc. 186-1 at 1. The retainer agreement sets an hourly fee. Doc. 7-2 at 12, 18. Litigation Lawyers

billed the Harbisons for work performed between August 2021 and January 2023. Doc. 7-2 at 22–145; doc. 186-1 at 3–4. The Harbisons' payments came up short by $469,772.04. Doc. 186-1 at 4. Thus, contract, breach, and damages.

In their opposition to summary judgment, the Harbisons abandon the affirmative defenses they raised in their amended complaint and thus have waived those affirmative defenses. *See* doc. 85 at 12–14; doc. 217; *Com. Union Ins. Co. v. McKinnon*, 10 F.3d 1352, 1354 (8th Cir. 1993) ("Although the [defendants] raised [a] defense in their answer, they failed to pursue it in the District Court. They did not even mention it in their response to [the plaintiff's] motion for summary judgment . . . . Thus, the issue was waived . . . .").

Instead, the Harbisons' opposition to summary judgment raises for the first time an affirmative defense that the Florida Supreme Court's disbarment of Rakusin—months after and for reasons unrelated to Litigation Lawyers' representation of the Harbisons ended, *see* doc. 219-3; doc. 219-4; doc. 186-1 at ¶ 8—"bars [Litigation Lawyers'] breach of contract claim" and only permits Litigation Lawyers to recover "under a quantum meruit theory." Doc. 217 at 4; *see Safeway Transit LLC v. Discount Party Bus, Inc.*, 954 F.3d 1171, 1182 (8th Cir. 2020) (defining an "affirmative defense" as an "assertion of facts and arguments that, if true will defeat the plaintiff's . . . claim, even if all the allegations in the complaint are true" (emphasis and citation omitted)). The Harbisons did not raise this defense in their amended answer and thus have waived it. *See* doc. 85 at 12–23 (mentioning Rakusin's disbarment only in passing and not as the basis of any defense or counterclaim); Fed. R. Civ. P. 12(b) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading . . . ."); *Crutcher v. MultiPlan, Inc.*, 22 F.4th 756, 765 (8th Cir. 2022) ("The failure to plead an affirmative defense results in its forfeiture and exclusion from the case.").

Accordingly, because the Harbisons do not identify any genuine disputes of material fact undermining Litigation Lawyers' breach-of-contract claim, the Court grants Litigation Lawyers' summary judgment motion with respect to the breach-of-contract claim. The Harbisons identify no genuine dispute of material fact about the damages for the breach-of-contract claim, either. Under Florida law, contract damages aim "to place the plaintiff in the position he would have been in had the contract been fulfilled." *CIMA Cap. Partners, LLC v. PH Cellular, Inc.*, 69 So.3d 293, 294 (Fla. Dist. Ct. App. 2010); *see Celsius Holdings, Inc. v. Strong Arm Prods., USA, Inc.*, 402 So. 3d 1040, 1042 (Fla. Dist. Ct. App. 2024). Here, that calculation is straightforward. The parties agree that the Harbisons "failed to pay [Litigation Lawyers] the outstanding balance of $469,772.04," so the damages for breach of contract are $469,772.04. Doc. 186-1 at ¶ 30.

Litigation Lawyers also seeks prejudgment interest. *See* doc. 197 at ¶ 2. "State law governs whether a diversity litigant may recover prejudgment interest." *Cont'l Indem. Co. v. IPFS of N.Y., LLC*, 7 F.4th 713, 719 n.7 (8th Cir. 2021). Florida law permits Litigation Lawyers to recover prejudgment interest dating from the date of the loss, which is normally deemed to be the date of the demand for payment. *See Vellef v. Control-O-Fax Corp.*, 682 So. 2d 1243, 1244 (Fla. Dist. Ct. App. 1996); *Adam v. Versailles Sur La Mer Condo.*, 973 So. 2d 466, 467 (Fla. Dist. Ct. App. 2007) (explaining that breach-of-contract plaintiffs are "entitled as a matter of law to recover prejudgment interest from the date of the loss"); *Memorial Health Sys., Inc. v. Hamilton Staffing Sols., Inc.*, 414 So. 3d 350, 352 (Fla. Dist. Ct. App. 2025) ("Florida courts have approved of the date of a demand for payment as the identifiable date of loss for purposes of calculating prejudgment interest." (citations omitted)). Because of the complexity of calculating the prejudgment interest on a succession of partial payments throughout 2022, the Court orders the parties to meet and confer and, no later than October 30, 2026, submit a

stipulation regarding the amount of prejudgment interest owed through that date. If the parties are unable to agree, then they must submit, no later than the same date, supplemental briefing on the amount of prejudgment interest owed.

### 2. Breach-of-the-implied-covenant-of-good-faith-and-fair-dealing counterclaim

The Harbisons assert a counterclaim for breach of the implied covenant of good faith and fair dealing. Doc. 85 at 21–22. They assert that "multiple controverted material facts" bar summary judgment on this counterclaim. Doc. 217 at 12. In particular, they argue that Litigation Lawyers breached the implied covenant of good faith and fair dealing by (1) failing to "perform only necessary legal services," (2) charging "excessive and unreasonable" fees, (3) failing to "represent the [Harbisons] in a manner consistent with their goals, including cost efficiency," (4) failing to "adhere to legal and ethical standards," (5) breaching a "fiduciary duty . . . to comply with Missouri Supreme Court Rule 4-1.5(a) and ABA Model Rule 1.4," (6) "failing to focus on settlement and resolution," and (7) ignoring the Harbisons' "reasonable contractual expectation that [Litigation Lawyers] would finish the representation and resolve" the underlying litigation. Doc. 217 at 10–11. For the reasons the Court discusses below, none of these grounds suffice to create a genuine issue of material fact about this counterclaim, and the Court grants summary judgment to Litigation Lawyers on it.

Florida contract law "recognize[s] an implied covenant of good faith and fair dealing in every contract." *QBE Ins. Corp. v. Chalfonte Condo. Apartment Ass'n*, 94 So. 3d 541, 548 (Fla. 2012). A party must ground its implied-covenant claim in an express contractual provision: "a duty of good faith must relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed." *Hosp. Corp. of Am. v. Fla. Med. Ctr., Inc.*, 710 So. 2d 573,

575 (Fla. Dist. Ct. App. 1998); *see also Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. Dist. Ct. App. 2001) (explaining that a good-faith-and-fair-dealing claim "cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached"). A party must also show that the breach of the contract provision "caus[ed] it damages." *Bookworld Trade, Inc. v. Daughters of St. Paul, Inc.*, 532 F. Supp. 2d 1350, 1359 (M.D. Fla. 2007); *see APR Energy, LLC v. Pak Power Res., LLC*, 653 F. Supp. 2d 1227, 1235 (M.D. Fla. 2009).

Litigation Lawyers encourages the Court to dismiss the Harbisons' good-faith-and-fair-dealing claim out of hand because the Harbisons abandoned their separate breach-of-contract counterclaim in their amended answer and counterclaims. *Compare* doc. 63 at 19–20, *with* doc. 85 at 18–23. Litigation Lawyers points to language in *QBE Insurance Corp. v. Chalfonte Condominium Apartment Ass'n* suggesting that a "limitation[]" applies to good-faith-and-fair-dealing claims "where there is no accompanying action for breach of an express term of the agreement." 94 So. 3d at 548; doc. 198 at 24. But, contrary to what Litigation Lawyers asserts, the "limitation" *QBE Insurance Corp.* references does not appear to be that the claim is "barred," doc. 198 at 24, but merely that "[a] duty of good faith must 'relate to the performance of an express term of the contract,'" *QBE Ins. Corp.*, 94 So. 3d at 548. The Harbisons tie their good-faith-and-fair-dealing counterclaim to the supposed breach of contractual provisions—paragraphs 1, 5, and 10 of the retainer agreement, doc. 85 at 16—as opposed to advancing the implied covenant of good faith and fair dealing as "an abstract and independent term." *QBE Ins. Corp.*, 94 So. 3d at 548.

Cases applying Florida law have not required parties to mechanistically pair a good-faith-and-fair-dealing claim with a breach-of-contract claim asserting the same breach. *See Nautica*

*Int'l, Inc. v. Intermarine USA, L.P.*, 5 F. Supp. 2d 1333, 1340–41 (S.D. Fla. 1998) (declining to dismiss a good-faith-and-fair-dealing claim that raised "an express breach of a term" of the parties' contract even though the plaintiff had not brought a separate breach-of-contract claim asserting the same breach); *cf. Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097–98 (Fla. Dist. Ct. App. 1999) (analyzing breach of contract and breach of the implied covenant of good faith and fair dealing even though the plaintiff asserted only a single breach-of-contract claim). The Court declines to grant summary judgment on the good-faith-and-fair-dealing claim on that basis.

Nonetheless, the Harbisons fail to identify any genuine disputes of material fact underlying their good-faith-and-fair-dealing claim. Their first three "controverted material facts"—that Litigation Lawyers (1) failed to "perform only necessary legal services," (2) charged "excessive and unreasonable" fees, and (3) failed to "represent the [Harbisons] in a manner consistent with their goals, including cost efficiency"—all amount to an argument that Litigation Lawyers overcharged the Harbisons. Doc. 217 at 10–11.

Notably, the Harbisons' overcharging objection does not assert that the contract rate itself—$480 per hour for Rakusin's services, doc. 7-2 at 12, 18—is excessive. Instead, they base their argument that Litigation Lawyers charged excessive fees solely on the number of hours worked. Doc. 85 at 17 (accusing Litigation Lawyers of "bill[ing] for excessive and unnecessary legal actions"); doc. 217 at 3 (criticizing Litigation Lawyers for "engag[ing] in excessive litigation"); *id.* at 8 ("Rakusin . . . billed for excessive and unnecessary legal actions . . . ."); *id.* at 11 ("[Litigation Lawyers'] 2,371 hours and associated fees of $1,040,753.84 are excessive and unreasonable . . . .").

None of these overcharging arguments identify a genuine dispute of material fact because the Harbisons waived any contractual objection to Litigation Lawyers' billing statements by never objecting to them during Litigation Lawyers' representation. Doc. 7-2 at 13; doc. 186-1 at ¶ 24; *Franklin & Marbin, P.A. v. Mascola*, 711 So.2d 46, 52 (Fla. Dist. Ct. App. 1998); *Gossett & Gossett, P.A. v. Mervolion*, 941 So. 2d 1207, 1209 (Fla. Dist. Ct. App. 2006); *Willis v. Nova Cas. Co.*, No. 21-13778, 2023 WL 334567, at *3 (11th Cir. 2023). Under applicable Florida law, they have consequently waived any assertion that Litigation Lawyers breached the contract by overcharging.

The retainer agreement provides that "[t]he Clients agree to carefully read all billing statements and promptly notify [Litigation Lawyers], in writing, of any claimed errors or discrepancies, within fifteen (15) days from the date of the statement." Doc. 7-2 at 13. If the client does not object within fifteen days, "it is presumed that the Clients agree with the correctness, accuracy and fairness of the billing statement." *Id.* Under Florida law, this provision of the retainer agreement acts as a waiver of any subsequent objection that Litigation Lawyers billed excessive hours.

In *Franklin & Marbin*, the Florida District Court of Appeal considered an agreement with nearly identical language:

> [The client] agree[s] to carefully read all billing statements and promptly notify [the firm], in writing, of any claimed errors or discrepancies, within fifteen (15) days from date of statement. If we do not hear from you in writing, it is presumed that you agree with the correctness, accuracy, and fairness of the billing statement.

711 So.2d at 47–48. The client in *Franklin & Marbin*—an individual who sought representation in a paternity action—did not object to the monthly billing statements because "she did not bother reading them." *Id.* at 48. The court enforced the provision, explaining that it "serve[d] important interests for both the client and the lawyer." *Id.* at 52. The provision "allow[ed] the

client to control the total, ultimate fee by overseeing the amount of time spent by the lawyer" and gave the client a way "to end the expenditure of further time before the amount due rises beyond the client's means." *Id.*

For the attorneys, the provision "serve[d] the equally important interest of requiring reasonably contemporaneous objections to the lawyer's billings" to protect the attorneys from "after-the-fact objections to the expenditure of time that might have been avoided if seasonably raised." *Id.* The court determined that, because the provision was valid, "the client's failure to object seasonably to the hours as they were billed would waive any objection to the number of hours billed and would operate as a tacit admission of the reasonability thereof in a later suit for a money judgment under the contract." *Id.*; *see also Willis*, 2023 WL 334567, at *3 (concluding that, under Florida law, clients waived any objection that "the number of hours billed [w]as excessive" by not objecting within the 30-day deadline in the fee agreement).

The same Florida court reached the same conclusion in *Gossett & Gossett*, even though the retainer agreement in that case did not set an explicit deadline for objecting to billing statements. 941 So. 2d at 1209. In *Gossett & Gossett*, the client's "live-in boyfriend . . . threatened that he was going to foreclose a second mortgage he held on the house they jointly occupied . . . unless [the client] paid him a sum certain within ten days." *Id.* at 1208. In the subsequent fee dispute between the client and her counsel, the court held that "it was error for the trial court to have reviewed the charges to the client and determined that the client owed less than she was billed when she had never previously questioned the charges" during the course of the representation. *Id.* at 1209.

In light of the valid objection-deadline provision in the retainer agreement, doc. 7-2 at 13, and the Harbisons' lack of any objection, much less timely objection, to Litigation Lawyers'

billing statements during the course of the representation, doc. 186-1 at ¶ 24, the Harbisons cannot now posit that "controverted material facts" exist about whether Litigation Lawyers overcharged them—and that overcharging breached the retainer agreement. *Franklin & Marbin*, 711 So.2d at 52. Because Florida law forecloses freewheeling good-faith-and-fair-dealing claims unmoored from the breach of a specific contract provision, Litigation Lawyers' purported overcharging does not create a genuine issue of material fact. *Hosp. Corp. of Am.*, 710 So. 2d at 575.

The Harbisons next assert that Litigation Lawyers' failure to "adhere to legal and ethical standards" creates a genuine issue of material fact about their good-faith-and-fair-dealing counterclaim. Doc. 217 at 10–11. The retainer agreement does mention that Litigation Lawyers would "use its best efforts to achieve the purpose of this engagement consistent with legal and ethical standards." Doc. 7-2 at 14. But the Harbisons cannot turn to unspecified "legal and ethical standards," doc. 217 at 10, to create a genuine dispute of material fact for their affirmative defenses. "[T]o survive [a] motion for summary judgment, [a party] need[s] to explain the legal significance of her factual allegations beyond mere conclusory statements importing the appropriate terms of art." *Quinn v. St. Louis County*, 653 F.3d 745, 752 (8th Cir. 2011); *see also Johnson Tr. of Operating Eng'rs Loc. #49 Health & Welfare Fund v. Charps Welding & Fabricating, Inc.*, 950 F.3d 510, 523 (8th Cir. 2020). In declining to concretize this supposed "controverted material fact[]," doc. 217 at 12, the Harbisons fail "to explain the legal significance of [their] factual allegations," *Quinn*, 653 F.3d at 752, and leave the Court to guess at what additional legal or ethical standards the Harbisons are referring to here beyond those enumerated in the Harbisons' other arguments. The absence of admissible expert testimony

further leaves the legal significance unexplained. The Harbisons cannot conjure a genuine dispute of material fact from an unsubstantiated reference to "legal or ethical standards."

Nor can the Harbisons invoke a "fiduciary duty . . . to comply with Missouri Supreme Court Rule 4-1.5(a) and ABA Model Rule 1.4," which prescribe rules for assessing the reasonableness of fees and for communicating with clients, as a genuine dispute of material fact here. Doc. 217 at 11. The Court need not consider whether Missouri Supreme Court Rule 4-1.5(a) and ABA Model Rule 1.4 apply to Litigation Lawyers' conduct, because, even if they did, the supposed breach of fiduciary duties external to the contract cannot satisfy the foundational prerequisite of a good-faith-and-fair-dealing claim: the breach of "an express term of the contract." *Snow v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 896 So. 2d 787, 792 (Fla. Dist. Ct. App. 2005) (quoting *Ins. Concepts*, 785 So. 2d at 1234).

As their sixth "controverted material fact[]," the Harbisons present Litigation Lawyers' "fail[ure] to focus on settlement and resolution." Doc. 217 at 11–12. The Harbisons do not identify a genuine issue of material fact that this alleged failure of Litigation Lawyers caused them damage and therefore fail to show one of the required elements of their good-faith-and-fair-dealing claim. *Bookworld Trade, Inc.*, 532 F. Supp. 2d at 1359; *see APR Energy, LLC*, 653 F. Supp. 2d at 1235.

The Harbisons do not identify a genuine issue of material fact that Litigation Lawyers' lack of a settlement plan caused the Harbisons any damage. In their opposition to summary judgment, when complaining that Litigation Lawyers did not pursue settlement options, the Harbisons cite only two sources: their statement of facts and Luepke's report. *See* doc. 217 at 8, 11 (citing doc. 219 at ¶¶ 16–17, 44–47). The relevant paragraphs of their statement of facts, in turn, point to Luepke's report, doc. 219 at ¶¶ 44–47, and the Harbisons' affidavits, which assert

only that Litigation Lawyers did not make any settlement plans, doc. 219-7, ¶ 18; doc. 219-8, ¶ 18. From all these citations, the only evidence relevant to causation is Luepke's speculative opinion that an earlier settlement would have been possible, an opinion the Court excludes as discussed above. The Harbisons point to no evidence that indicates that, had Litigation Lawyers pursued settlement earlier, the outcome of the underlying litigation might have changed. *Grandview Palace Condo. Ass'n, v. Judge*, No. 3D25-0458, 2026 WL 2176802, at *4 (Fla. Dist. Ct. App. July 29, 2026) (holding that, under Florida contract law, "mere speculation, suspicion, surmise, or conjecture" does not suffice to establish causation" (citation omitted)); *Jones v. Law Firm of Hill & Ponton*, 223 F. Supp. 2d 1284, 1291 (M.D. Fla. 2002) (noting that showing causation for Florida-law contract claims requires "more than mere speculation"); *Grethaka Sols. OU v. Click Labs, Inc.*, No. 8:22-cv-1341-WFJ-SPF, 2024 WL 326622, at *3 (M.D. Fla. Jan. 29, 2024) (explaining that "speculation" does not prove that one party "caused [another] to suffer lost profits").

That alone suffices to find that the alleged lack of, or failure to pursue, a settlement strategy creates no genuine dispute of material fact about the good-faith-and-fair-dealing counterclaim. *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 734–35 (8th Cir. 2009) ("It was [the nonmovant's] responsibility to show that there were genuine issues of material fact in the record that precluded the summary judgment Appellees sought below. . . . It was not the District Court's responsibility to sift through the record to see if, perhaps, there was an issue of fact.").

Having conducted its own review of the evidence, the Court finds that no genuine dispute of material fact exists regarding causation. The parties do not dispute that settlement attempts between the Harbisons and Patriots Bank had fizzled out months before the Harbisons retained

Litigation Lawyers. Doc. 218 at ¶¶ 53–75. The parties stipulated that Patriots Bank "did not extend any settlement offer to the Harbisons during the entirety" of Litigation Lawyers' representation. Doc. 186-1 at ¶ 16. And, as the Court explained in its order dismissing the Harbisons' legal malpractice counterclaim, doc. 101 at 13–16, the Harbisons' settlement agreement from the end of 2023, doc. 186-1 at 6–20, nearly a year after Litigation Lawyers' representation ended, does not create a genuine issue of material fact about whether Litigation Lawyers could have settled the underlying litigation earlier. Here again, the Court notes that the Harbisons point to nothing in their fulsome communications with Rakusin suggesting that they wanted, or instructed Litigation Lawyers, to pursue settlement; they likewise fail to come forward with affidavits to (possibly) fill this glaring hole in the evidence. Overcoming summary judgment requires an issue for a jury to decide, but here no such issue exists.

In a final attempt to identify a genuine issue of material fact underlying their good-faith-and-fair-dealing claim, the Harbisons argue that Litigation Lawyers ignored the Harbisons' "reasonable contractual expectation that [Litigation Lawyers] would finish the representation and resolve" the underlying litigation, which supposedly led the Harbisons to "incur[] significant additional attorney fees and expenses in having to secure substitute counsel to resolve the underlying cases. Doc. 217 at 11. This argument, too, fails because the Harbisons identify no evidence that the withdrawal caused them any damages. If Litigation Lawyers had not withdrawn, the Harbisons would still have "incurred significant additional attorney fees and expenses" by continuing to pay Litigation Lawyers. *Id.* To show that the substitution caused them any damages, the Harbisons would have to point to evidence that they would have incurred damages above what they would have paid to Litigation Lawyers. They do not.

Because the Harbisons identify no genuine disputes of material fact to sustain their good-faith-and-fair-dealing counterclaim, the Court grants Litigation Lawyers' motion for summary judgment on it.

**3. Breach-of-fiduciary-duty counterclaim**

Under Missouri law, a breach-of-fiduciary-duty claim against an attorney has five elements: "(1) an attorney-client relationship, (2) breach of a fiduciary obligation by the attorney, (3) proximate causation, (4) damages to the client; [and] (5) no other recognized tort encompasses the facts alleged." *Klemme v. Best*, 941 S.W. 2d 493, 496 (Mo. 1997). "An attorney's fiduciary duties equate specifically to client loyalty and confidentiality, in contrast to contractual obligations or the duty of due care." *Costa v. Allen*, 274 S.W.3d 461, 462 (Mo. 2009). The duty of loyalty requires "that the attorney must act solely for the benefit of the client and may not acquire interests adverse to the client without disclosure and acquiescence." *Portman v. Madesco Inv. Corp.*, 760 S.W.2d 457, 462 (Mo. Ct. App. 1988); *see also Shaffer v. Terrydale Mgmt. Corp.*, 648 S.W.2d 595, 605 (Mo. Ct. App. 1983).

In contrast, professional negligence is a breach of an attorney's duty of care but not a breach of the attorney's fiduciary duty of loyalty. *See Klemme*, 941 S.W. 2d at 495 ("A legal malpractice action . . . is founded on an attorney's duty to exercise due care or to honor express contract commitments."); *SKMDV Holdings, Inc. v. Green Jacobson, P.C.*, 494 S.W.3d 537, 545 (Mo. Ct. App. 2016) (listing negligence as an element of a legal malpractice claim); *Alberts v. Turnbull Conway, P.C.*, 641 S.W.3d 370, 375 (Mo. Ct. App. 2022) (treating a duty of care as a prerequisite to bringing a legal malpractice claim). When analyzing the fifth element of a breach-of-fiduciary-duty claim, Missouri courts have been clear that breach-of-fiduciary-duty claims against attorneys must stand "independent of any legal malpractice." *Klemme*, 941 S.W.2d at 496. If the asserted

breach of fiduciary duty is "'dependent on' the existence of attorney negligence," "[t]he alleged breach [is] 'no more than an action for attorney malpractice.'" *Id.* (quoting *Donahue v. Shughart, Thomson & Kilroy, P.C.*, 900 S.W.2d 624, 629–30 (Mo. 1995)). And "[i]f the alleged breach can be characterized as both a breach of the standard of care (legal malpractice based on negligence) and a breach of fiduciary obligation (constructive fraud), then the sole claim is legal malpractice." *Id.*; *see Minor v. Terry*, 475 S.W.3d 124, 131 n.5 (Mo. Ct. App. 2014), *overruled in part on other grounds*, *Vacca v. Mo. Dep't of Lab. & Indus. Rels.*, 575 S.W. 3d 223 (Mo. 2019).

The Harbisons do not contend that Litigation Lawyers breached attorney-client confidentiality or placed the interests of other clients above the Harbisons' interests. Instead, they argue that Litigation Lawyers' handling of the underlying litigation amounts to a breach of loyalty because Litigation Lawyers "engaged in disloyal and self-serving conduct that placed [Litigation Lawyers'] interests above those of the [Harbisons]." Doc. 217 at 8. But for the Harbisons' breach-of-fiduciary-duty claim to survive summary judgment, they must identify a genuine issue of material fact about whether Litigation Lawyers' handling of the underlying litigation was more than just professionally negligent. *See Klemme*, 941 S.W.2d at 496. Because they fail to do so, the Court grants summary judgment to Litigation Lawyers on the Harbisons' breach-of-fiduciary-duty counterclaim.

In support of their counterclaim, the Harbisons assert that they "have presented this Court with extensive controverted material facts." Doc. 217 at 8. These "controverted material facts" include that (1) "Rakusin engaged in ineffective motion practice, pursued legal actions contrary to established precedent, and [took] other improper actions that unnecessarily prolonged litigation," (2) Litigation Lawyers did not implement a settlement strategy or advise the Harbisons about

settlement, and (3) "Rakusin pursued costly and unnecessary litigation" and "did not bill for 'necessary' and/or 'cost efficient' legal actions." Doc. 217 at 8–9.

But the Harbisons' list of "controverted material facts" does not suffice to show a genuine dispute of material fact about the fifth element of a breach-of-fiduciary-duty counterclaim: that "no other recognized tort encompasses the facts alleged." *Klemme*, 941 S.W. 2d at 496. Each of the Harbisons' "controverted material facts" would be right at home in a legal malpractice claim asserting professional negligence—so at home, in fact, that the Harbisons' dismissed legal-malpractice claim rested on allegations of precisely the same conduct. *See* doc. 85 at ¶¶ 32, 35 (alleging, in support of legal malpractice claim, that Rakusin "fail[ed] to prepare and implement an effective legal strategy," "fail[ed] to consider established legal precedent when advancing legal arguments," "fail[ed] to prepare and implement a reasonable settlement strategy," and "perform[ed] unnecessary and ineffective legal services").

The reasoning in *Hiscox Ins. Co. v. Warden Grier, LLP*, is persuasive. No. 4:20-cv-00237-NKL, 2021 WL 5828042 (W.D. Mo. Dec. 8, 2021). There, the plaintiff client argued that the defendant firm "breached its professional obligations by failing to inform" the client about a data breach, "conduct an adequate analysis of the hacked data[,] and provide the results of that analysis to [the client]." *Id.* at *4. "And because [the firm's] breach was purportedly motivated by its own self-interest—its desire to avoid costs—[the client] argue[d] [the firm] also violated its duty of loyalty." *Id.* Explaining that "[s]imply framing the alleged breach of the standard of care as motivated by [the firm's] desire to avoid the costs inherent in analyzing the data is not enough to allege a breach of a fiduciary duty 'independent of any [claim of] legal malpractice,'" the court found that "the alleged violation of the duty of loyalty is simply an extension of—or a gloss on—the alleged violation of the duty of care, and not a truly independent breach of fiduciary duty." *Id.*

(alterations omitted) (quoting *Klemme*, 941 S.W.2d at 496). As a result, the court held that the plaintiff could only bring a legal malpractice claim, and that the breach-of-fiduciary-duty claim failed. *Id.*

So too here. "Simply framing the alleged breach of the standard of care as motivated by [Litigation Lawyers'] desire" to prolong litigation and run up the Harbisons' tab "is not enough to allege a breach of fiduciary duty 'independent of any [claim of] legal malpractice.'" *Id.* At most, "the alleged breach can be characterized as both a breach of the standard of care (legal malpractice based on negligence) and a breach of fiduciary obligation (constructive fraud)," so "the sole claim" available to Litigation Lawyers "is legal malpractice." *Klemme*, 941 S.W.2d at 496. The Harbisons' lone assertion that "Rakusin engaged in disloyal and self-serving conduct that placed [Litigations Lawyers'] interests above those of the [Harbisons]," supported only by a citation to Luepke's now-excluded report, does not create a genuine issue of material fact. Doc. 217 at 8 (citing doc. 219-1; doc. 219-2 at 9–10). The Harbisons fail to create a genuine issue of material fact about whether a "recognized tort" "encompasses the facts alleged," which can be "characterized as both a breach of the standard of care (legal malpractice based on negligence) and a breach of fiduciary obligation." *Klemme*, 941 S.W.2d at 496; *see* doc. 85 at ¶¶ 32, 35.

Because the Harbisons point to no evidence suggesting that any mismanagement of the underlying litigation resulted from Litigation Lawyers' disloyalty as opposed to professional negligence, the Harbisons fail to identify a genuine issue of material fact about the fifth element of their breach-of-fiduciary-duty claim. At this stage, the breach-of-fiduciary-duty counterclaim is nothing more than an attempt to resurrect the dismissed legal malpractice counterclaim. Doc. 101 at 13–16. The Harbisons' breach-of-fiduciary-duty counterclaim therefore fails as a matter of law, and the Court grants summary judgment to Litigation Lawyers on that counterclaim.

## V. Conclusion

Accordingly, the Court denies the Harbisons' [193] Motion for Judgment on the Pleadings. The Court grants Litigation Lawyers' [195] Motion to Strike or Exclude the Expert Opinions of Henry F. Luepke, III. and [197] Motion for Summary Judgment, and enters judgment in favor of Litigation Lawyers in the amount of $469,772.04 plus prejudgment interest in an amount to be determined. The Court orders the parties to, no later than October 30, 2026, meet and confer and submit either a stipulation or supplemental briefing on the amount of prejudgment interest owed. A separate judgment accompanies this Memorandum and Order.

So ordered this 17th day of October 2026.

STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE